**Jo LIGENZA, Plaintiff,**

v.

**GENESIS HEALTH VENTURES OF MASSACHUSETTS, INC., et al., Defendants.**

**No. Civ.A. 96–30201–KPN.**

United States District Court, D. Massachusetts.

Feb. 20, 1998.

**227**

Frederick A. Hurst, Hurst & Hurst, Springfield, MA, for Plaintiff.

Martin M. Fantozzi, Leonard H. Freiman, David W. Fanikos, Goulston & Storrs, Boston, MA, for Defendants.

*MEMORANDUM REGARDING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT (Docket Nos. 32 and 33)*

NEIMAN, United States Magistrate Judge.

Jo Ligenza ("Plaintiff") filed a claim against Genesis Health Ventures of Massachusetts ("Genesis") and three individual supervisors ("Individual Defendants") with the Massachusetts Commission Against Discrimination ("MCAD"). Plaintiff's claim was filed three months after she was fired from her position with Genesis as a respiratory therapist. Before receiving a decision from the MCAD, Plaintiff removed her complaint to this court. The parties have consented that

the matter be heard by the court pursuant to 28 U.S.C. § 636(c) and Fed.R.Civ.P. 73(b).

In her sixteen count civil rights claim, filed pursuant to 42 U.S.C. § 2000e, Title VII of the Civil Rights Act of 1964 ("Title VII"), and M.G.L. ch. 151B, Plaintiff alleges that Genesis subjected her to sexual harassment by promoting a hostile work environment. According to Plaintiff, during the fifteen months she was employed by Genesis, both Genesis and the Individual Defendants failed to remediate repeated sexual harassment against her by an elderly ventilator-dependent resident in her charge and then retaliated against her when she complained. Before the court is Genesis' motion for summary judgment on Counts I through IV and the Individual Defendants' motion for summary judgment on Counts V through XVI. For the reasons which follow, the court will allow both motions.

## I. SUMMARY JUDGMENT STANDARD

In accord with Fed.R.Civ.P. 56(c), summary judgment must be granted if "there is no genuine issue as to any material fact" and "the moving party is entitled to a judgment as a matter of law." *See* Fed.R.Civ.P. 56(c); *Magee v. United States,* 121 F.3d 1, 3 (1st Cir.1997). Once the moving party has demonstrated that no genuine issue of material fact exists, the burden is on the opposing party to contradict the demonstration by coming "forward with specific provable facts which establish that there is a triable issue." *Matos v. Davila,* 135 F.3d 182, 185 (1st Cir. 1998).

A genuine issue is one which a reasonable fact finder could resolve in favor of the nonmoving party. *Id.* Not every genuine factual conflict, however, necessitates a trial. "It is only when a disputed fact has the potential to change the outcome of the suit under the governing law if found favorably to the nonmovant that the materiality hurdle is cleared." *Parrilla–Burgos v. Hernandez–Rivera,* 108 F.3d 445, 448 (1st Cir.1997) (internal quotations omitted). Indeed, even in employment discrimination cases, where elusive concepts such as motive or intent are at issue, summary judgment may be appropriate if the nonmoving party rests merely upon

conclusory allegations, improbable inferences, and unsupported speculation. *DeNovellis v. Shalala,* 124 F.3d 298, 306 (1st Cir. 1997).

## II. *FACTUAL BACKGROUND*

Plaintiff was hired by Genesis on August 18, 1994, as a part time per diem employee. (See Def. Exhibit 7 (Ligenza Dep. Vol. I at 127–28).) She was one of four respiratory therapists hired to work in one of Genesis' long term care facilities, Heritage Hall South Nursing & Rehabilitation Center ("Heritage") in Agawam, Massachusetts. (Ligenza Dep. Vol. I at 133.)

Beginning in March of 1995, Defendant Jeffrey Heinze ("Heinze") was the Administrator at Heritage. (Def. Exhibit 5(Heinze Aff. ¶ 3).) In that capacity, he was generally responsible for the operation and management of the facility and for supervision of its one hundred thirty employees. (Id.) Defendant Patricia Bergland ("Bergland") was the Director of Nursing from May of 1994 through, coincidentally, October 26, 1995, the day Plaintiff was terminated, reporting first to the previous administrator and then to Heinze. (Def. Exhibit 1 (Bergland Dep. at 13).) Bergland was responsible for supervision of the approximately seventy-five nurses, nurses aides and respiratory therapists, (id.), and was Plaintiff's immediate supervisor the entire time Plaintiff was employed at Genesis. (Ligenza Dep. Vol. 1 at 122–25.)

From the time that Plaintiff began at Heritage until August of 1995, Michelle Nie was the Unit Manager of A–Wing, the wing on which Plaintiff worked. (Id. at 126.) Beginning in August of 1995, Defendant Irene Smith ("Smith") was the Unit Manager of A–Wing. Smith reported to Bergland. (Def. Exhibit 10 (Smith Aff. ¶ 2).) Although the Unit Manager oversaw operations on A–Wing, Plaintiff testified at deposition that she considered the position to be that of a coworker, not a supervisor. (Ligenza Dep. Vol. I at 127.)

As a respiratory therapist, Plaintiff was primarily responsible for monitoring respirator-dependent patients. (Ligenza Dep. Vol I at 125.) There were three such patients on A–Wing. (Id.) One was a sixty-nine year old, virtually bedridden, male (hereinafter referred to as the "Patient"), who was admitted to Heritage on January 24, 1994, and resided there until his death in May of 1996. (Smith Aff. ¶ 4; Ligenza Dep. Vol I at 148.) Information provided by Noble Hospital, the facility from which the Patient transferred, indicated that he made inappropriate sexual comments to female staff members while at that facility. (Pl. Exhibit 1.) Genesis was made aware of this behavior through the required forms sent contemporaneously with the Patient's transfer. (Bergland Supp. Aff. ¶¶ 6–7.)

After his arrival at Heritage, the Patient was evaluated periodically by physicians and social workers who determined that he was depressed. (Bergland Dep. at 46–47.) It was also determined that he made inappropriate, often sexual, comments to the staff. (Id.) As a result, Genesis formulated a care plan to address his depression and misbehavior. (Id. at 96.) The care plan, instituted in July of 1994, instructed all staff members to immediately document instances of inappropriate behavior on monitoring charts and indicate the inappropriateness of the behavior to Patient. (Pl. Exhibit 2a; Def. Exhibit 8 (Ligenza Dep. Vol II at 33).)

Despite this plan, Patient's inappropriate behavior continued. On October 20, 1994, therefore, Genesis began another phase of its care plan. To that end, it contracted with a private vendor, American Geriatric Services, to provide the Patient with counseling and psychotherapy, efforts which continued after Plaintiff was terminated. (Bergland Dep. at 97–100.)

Plaintiff claims that, despite Genesis' care plan, the Patient acted inappropriately toward her from almost the day she began working at Heritage. (Pl. Exhibit 3a.) Pursuant to the care plan, Plaintiff and other employees made numerous notations regarding the Patient's behavior on the monitoring charts provided by Genesis. (Pl. Exhibits 2–5; 7–8.) In addition, according to Plaintiff, she complained to several coworkers about Patient's behavior, although she never complained to any of her supervisors. (Ligenza Dep. Vol II at 22–23). However, Plaintiff once had a conversation with Bergland regarding the inappropriateness of Patient being permitted to lay naked in his bed. (Id.)

On October 26, 1995, Plaintiff was cleaning the tube which ran from the Patient's respirator to his throat when she noticed that he was looking up her blouse. (Ligenza Dep. Vol II at 43–45.) In response, Plaintiff hit the Patient. (Id. at 45.) When she left the room Plaintiff told a co-worker, "I think I am going to be fired. I just hit [Patient]." (Id.) Plaintiff then spoke with Smith and, at her direction, completed an incident report. (Id. at 46.) The incident report was immediately forwarded to Bergland. (Id. at 47–48 .) Later that day, Plaintiff met with Bergland. (Id. at 49.) At the beginning of the meeting Plaintiff admitted to hitting the Patient and stated, "I will (probably be terminated." (Id.) Plaintiff was terminated that same day. (Id. at 50.)

At all times during Plaintiff's employment, Genesis had a sexual harassment policy set forth in its employee handbook. (Ligenza Dep. Vol I at 114; Def. Exhibit 3. (Emp. Handbook at 2).) Plaintiff never registered a formal complaint of harassment pursuant to that policy. (Bergland Dep. at 39, 115.)

### III. *DISCUSSION*

#### A. *Genesis' Motion for Summary Judgment*

"Title VII of the Civil Rights Act of 1964 provides that it is an 'unlawful employment practice for an employer ... to discriminate against any individual with respect to his compensation, terms, conditions or privileges of employment because of such individual's ... sex'." *Morrison v. Carleton Woolen Mills, Inc.,* 108 F.3d 429, 436 (1st Cir.1997) (quoting 42 U.S.C. § 2000e–2(a)(1)). The law was intended to provide a "broad rule of workplace equality." *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 22, 114 S.Ct. 367, 371, 126 L.Ed.2d 295 (1993). Consistent with that legislative intent, sexual harassment has been found to be one virulent form of sex discrimination in the workplace. *Id.*

The Massachusetts civil right statute is equally clear and broadly remedial. It provides that it shall be unlawful:

> For an employer, by himself or his agent, because of the race, color, religious creed, national origin, sex, sexual orientation, which shall not include persons whose sexual orientation involves minor children as

the sex object, or ancestry of any individual to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment, unless based upon a bona fide occupational qualification.

M.G.L. ch. 151B § 4(1). Sexual harassment is prohibited under that civiL rights law as well. *College–Town Div. of Interco, Inc. v. Massachusetts Comm'n Against Discrimination,* 400 Mass. 156, 508 N.E.2d 587, 590 (1987).

Two different types of sexual harassment claims have been isolated under both the federal and state statutes. *Morrison,* 108 F.3d at 436; *College–Town,* 508 N.E.2d at 591. One such claim is quid pro quo harassment in which a supervisor requires sexual favors from his or her employee as a term or condition of employment. *Morrison,* 108 F.3d at 436; *College–Town,* 508 N.E.2d at 591. That is not the allegation at bar. The instant claim is of the other variety, namely, when an employer fosters or allows a hostile work environment based on gender. *Morrison,* 108 F.3d at 436; *College–Town,* 508 N.E.2d at 591. Plaintiff also asserts a claim of retaliation for opposing the alleged harassment.

In its motion for summary judgment, Genesis asserts with respect to Counts I and II that it is not liable for sexual harassment because it did not acquiesce to the Patient's sexually charged behavior toward Plaintiff. Second, Genesis maintains, Plaintiff cannot show that Genesis knew or should have known of the hostile work environment or took inappropriate remedial action. Finally, with respect to Counts III and IV, Genesis asserts that Plaintiff cannot establish that the proffered reason for her discharge—striking a patient—was a pretext for sex discrimination.

#### 1.

A claim of a hostile work environment can survive at this juncture only if sufficient evidence exists that unwelcome conduct based on an employee's sex occurred within the employment setting. *Harris,* 510 U.S. at 21–22, 114 S.Ct. at 370–71. Moreover, such conduct must be severe and pervasive

enough to interfere with the terms and conditions of one's employment and create an abusive environment. *Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 67, 106 S.Ct. 2399, 2405–06, 91 L.Ed.2d 49 (1986).

Genesis concedes that, under certain circumstances, albeit limited, employers can be held liable for sexually charged actions of non-employees toward employees. Applicable guidelines of the Equal Employment Opportunity Commission explain:

> An employer may also be responsible for the acts of non-employees, with respect to sexual harassment of employees in the workplace, where the employer (or its agents or supervisory employees) knows or should have known of the conduct and fails to take immediate and appropriate corrective action. In reviewing these cases the Commission will consider the extent of the employers control and any other legal responsibility which the employer may have with respect to the conduct of such employees.

29 C.F.R. § 1604.11(e)(1996). *Compare Lipsett v. Univ. of Puerto Rico*, 864 F.2d 881, 901 (1st Cir.1988) (employer liable for hostile environment sexual harassment perpetrated by supervisors if employer knew or should have known of the harassment and took no appropriate steps to halt it). In essence, an employer may be liable for non-employee misconduct when the employer has the requisite knowledge and control over the situation and fails to take remedial action.

In cases involving restaurants and casinos, for example, employers have been found liable for a patron's sexual harassment of employees when the employer either ratified or acquiesced in the harassment by not taking immediate and corrective action. A casino owner is deemed to have control over the situation and the ability to remove or ban a harassing patron from the premises. *Folkerson v. Circus Circus Enter.*, 107 F.3d 754, 756 (9th Cir.1997). Likewise, an employer whose independent contractor is harassing an employee can terminate the contract. *See Sparks v. Reg'l Med. Ctr. Bd.*, 792 F.Supp. 735, 738 (N.D.Ala.1992). *See also Fiske v. R.P. Liquor*, 16 MDLR 1044, 1054 (1994) (based on agency principles, employer liable under M.G.L. ch. 151B for hostile work environment created by owner's friend).

Concomitantly, an employer can be held liable for harassment of employees by non-employees in the event of the employer's nonfeasance. *Folkerson*, 107 F.3d at 756 (employer liable if it fails to take corrective action against a patron involved in sexual misconduct against an employee); *Powell v. Las Vegas Hilton Corp.*, 841 F.Supp. 1024, 1028 (D.Nev.1992) (same); *Sparks*, 792 F.Supp. at 735 (medical center may be liable for sexual misconduct of independent contractor).

■ Genesis claims, however, that it is in a distinctly different position than such employers because its relationship with patients is significantly constrained by federal and state regulations governing long term care facilities. Patients at such facilities are protected by a full range of rights, 42 C.F.R. §§ 483.10 (resident rights), 483.12(2) (transfer and discharge requirements), cannot be physically restrained for disciplinary purposes, 42 C.F.R. § 483.13; M.G.L. ch. 123 § 21, and cannot be transferred or discharged from a facility for sexual misconduct, 130 C.M.R. 610.220, (A). Moreover, Genesis avows, violation of these regulations exposes it to liability under M.G.L. ch. 93A, the state's consumer protection statute. Finally, as a practical matter, many residents of long term care facilities, including the Patient here, are either physically or mentally ill or both, making it far more likely that they may act in inappropriate ways.

Notwithstanding these considerations, the court does not believe that Genesis can shield itself from liability under Title VII and M.G.L. ch. 151B simply by relying on such regulations. State and federal laws cannot be administered in a discriminatory fashion. *See E.E.O.C. v. Allegheny County*, 705 F.2d 679, 681 (3d Cir.1983); *Kober v. Westinghouse Elec. Corp.*, 480 F.2d 240, 246 (3d Cir.1973) (citing cases). *Cf. E.E.O.C. v. Commonwealth of Massachusetts*, 987 F.2d 64, 71 (1st Cir.1993). Although patients have rights, employees of long term care facilities also have the right to a workplace free from sexual harassment. Thus, Genesis may not disclaim all responsibility toward its employees in the name of patient care.

Moreover, the court does not read the cited regulations in as restrictive a way as does Genesis. The regulations do not appear to foreclose Genesis from seeking to remove a patient from its facility. If anything, the regulations provide that if "the safety of individuals in the nursing facility is endangered" or "the health of the individuals in the nursing facility would be otherwise endangered," 130 C.M.R. 610.220(A); , 42 C.F.R. § 483.12, some affirmative action, including removal, may be permissible. Genesis' avowed lack of control over the situation appears to overstate the constraints within which it operates.

 The court also rejects Genesis' claim that its written sexual harassment policy protects it from any constructive knowledge of actual harassment. The "Supreme Court has refused to guarantee safe harbor to every employer that provides a grievance procedure and policy against discrimination where the complaining employee failed to invoke that procedure." *Cotto v. Gen. Accident Ins. Co. of Puerto Rico, Ltd.*, 975 F.Supp. 410, 415 (D.P.R.1997) (citing *Meritor*, 477 U.S. at 72, 106 S.Ct. at 2408). For an employer to insulate itself on that basis, the written policy must be clear, specific and alert to the consequences of sexual harassment. *Id. See Farley v. Amer. Cast Iron Pipe Co.*, 115 F.3d 1548, 1554 (11th Cir.1997).

The applicable policy in the instant matter does not provide such protection. Genesis' sexual harassment "policy" consists of a single line in its Employment Policy Statement and indicates that an individual, believing him or herself to have been harassed, may file a complaint which will be investigated by the Regional Director. (Def. Exhibit 3.) In the court's estimation, this policy, standing alone, hardly shields Genesis from liability.

 Nonetheless, because Plaintiff has not produced any material evidence with respect to the essential elements of her claim of sexual harassment, the court believes that Genesis is entitled to summary judgment with respect to Counts I and II. *See Meritor*, 477 U.S. at 69, 106 S.Ct. at 2406–07 (the existence of sexual harassment must be assessed "in light of the record as a whole and the totality of circumstances."). Thus, even were the court to find that the Patient's offensive action, looking up her blouse, was

sufficiently severe and pervasive, which is doubtful, Plaintiff has not shown, nor can she show, that Genesis had actual or constructive knowledge that the Patient's conduct created a hostile environment which unreasonably interfered with Plaintiff's employment.

It is undisputed that Genesis knew that the Patient who was sixty-nine years old, depressed and bedridden, made inappropriate, often sexual, comments to female staff workers. For that very reason, Genesis devised a care plan to address both his mental health and his misconduct, requiring all employees responsible for the Patient's care, including Plaintiff, to note the Patient's behavior on his chart and immediately indicate to him its inappropriateness. When the Patient's behavior persisted, a more intensive regimen was implemented, including counseling and psychotherapy. At no time did Genesis tacitly acquiesce in the Patient's behavior.

However, and more importantly for purposes here, it is also undisputed that Plaintiff never complained to Genesis management about the Patient's behavior. Although she may have complained to several co-workers, the closest Plaintiff came to an allegation of "harassment" was when she mentioned to Bergland the inappropriateness of the Patient being allowed to lie naked in his bed. As a matter of law, however, that single incident does not rise to the level of sexual harassment, let alone a complaint about sexual harassment. So, while an employer, including a nursing home, may be liable for the actions of non-employees, including patients, this is not a situation which necessitates such a finding.

Everybody who came in contact with the Patient from the day he arrived was aware of his problems. His inappropriate behavior was consistently noted and addressed by Genesis in a professional fashion. There is simply no evidence that Genesis had any knowledge of the alleged effect of the Patient's behavior on Plaintiff, beyond what would reasonably be expected in a nursing home. Indeed, the first time Plaintiff reported that she believed the Patient's behavior amounted to sexual harassment was when she filed her complaint with the MCAD,

three months after her termination. Without any prior awareness that the misconduct created a hostile work environment for Plaintiff in particular, Genesis had no duty to take any further remedial action. Plaintiff proffers no evidence to the contrary. Accordingly, summary judgment will be allowed on the sexual harassment counts, Counts I and II, against Genesis.

2.

■ With respect to Counts III and IV, Plaintiff's claims against Genesis for retaliation, the elements of such claims are essentially the same under both Title VII and M.G.L. ch. 151B. *See Fennell v. First Step Designs, Ltd.*, 83 F.3d 526, 535 (1st Cir.1996); *Lewis. v. Gillette Co.*, 22 F.3d 22, 24–25 (1st Cir.1994); *MacCormack v. Boston Edison Co.*, 423 Mass. 652, 672 N.E.2d 1, 7 (1996). To establish a *prima facie* case of retaliation, a plaintiff must demonstrate first that she engaged in an activity protected by Title VII or M.G.L. ch. 151B or that she complained of a violation of those statutes. *Lewis*, 22 F.3d at 24–25. The success of her claim requires only that she reasonably believed the conduct she protested violated those statutes. *Rodriguez–Hernandez v. Miranda–Velez*, 132 F.3d 848, 855 (1st Cir.1998). Next, a plaintiff must show that "she suffered an adverse employment action . . . and [that] a causal connection existed between the protected conduct and the adverse action." *Fennell*, 83 F.3d at 535. *See also Lewis*, 22 F.3d at 24–25; *Costello v. Massachusetts Rehab. Comm'n*, 982 F.Supp. 61, 66 (D.Mass.1997).

Following the burden shifting paradigm in discrimination cases, once a plaintiff makes a *prima facie* showing of retaliation, the defendant must proffer a legitimate non-discriminatory reason for the adverse employment action. *Fennell*, 83 F.3d at 535. Once proffered, the burden shifts back to the plaintiff to offer sufficient evidence that the proffered reason is pretextual. *Denovellis v. Shalala*, 135 F.3d 58, 63, (1st Cir.1998); *Miner v. Connleaf, Inc.*, 989 F.Supp. 49, 52 (D.Mass. 1997); *Blare v. Husky Injection Molding Sys. Boston, Inc.*, 419 Mass. 437, 646 N.E.2d 111, 117 (1995). More specifically, "[i]n a retaliation case, the plaintiff must prove by a preponderance of the evidence that the articulated reason, in significant measure, was a pretext for retaliation." *Ruffino v. State Street Bank and Trust Co.*, 908 F.Supp. 1019, 1045 (D.Mass.1995).

If the claim is brought pursuant to Title VII, as opposed to M.G.L. ch. 151B, the plaintiff must also demonstrate evidence that discriminatory animus motivated the decision to retaliate. *Miner*, 989 F.Supp. at 52. Such retaliation may be shown by sufficient evidence that the adverse employment action occurred shortly after the protected activity. *Costello*, 982 F.Supp. at 66. In the alternative, a plaintiff may show retaliation through evidence that otherwise similarly situated individuals did not suffer the same adverse employment consequences. *Id.*

■ The court questions whether Plaintiff can even make a *prima facie* showing of retaliation, it being somewhat unclear in what protected activity she claims to have been engaged. At best, Plaintiff contends that Genesis terminated her in retaliation for her "self-report[ing]" sexual harassment by the Patient: looking up her blouse. This particular "complaint," which Plaintiff claims is distinguishable from her prior notations of the Patient's inappropriate behavior, occurred simultaneously with her reporting that she slapped him.

Even were the court to presume that Plaintiff makes a *prima facie* showing, she has not demonstrated the existence of specific facts that Genesis' nondiscriminatory justification for her termination—slapping a patient—was a mere pretext for retaliation. Plaintiff does not dispute the fact that she struck the Patient. In fact, Plaintiff stated at the time of the incident and again at deposition that she "hit [Patient]". Plaintiff also stated to a co-worker, just after she hit the Patient, that "I think I am going to be fired." Finally, when Plaintiff met with her supervisor, that same day, she said, "I will probably be terminated." Plaintiff points to no evidence that Genesis' decision to terminate her for the very reason she predicted was not well within anticipated norms or a pretext for retaliation. It strains credulity to believe that, since July of 1994, Genesis would have requested that staff members record the Patient's inappropriate behavior

only to terminate Plaintiff fifteen months later for following those directions.

Genesis' employee handbook states that, "negligence and inconsiderate treatment in the case of patients" "may result in ... termination" and "rude, discourteous or uncivil behavior; fighting with other persons on facility property" may also "result in disciplinary action and/or termination". In the court's opinion, such grounds for termination are significantly less severe than the incident in question. If termination is justified for negligence or fighting on Genesis' property, then Genesis' proffered reason for terminating Plaintiff, hitting the Patient, is well grounded in its policies. Plaintiff offers little evidence that the termination was pretextual and no evidence that any other Genesis employee who became physical with a patient in violation of policy was allowed to keep his or her position.

In sum, no issues of fact need be resolved here. The only reasonable inference from the evidence presented to the court is that Genesis terminated Plaintiff because she struck a resident, not to retaliate against her. Thus, it is clear that Plaintiff's case fails under both the "pretext only" standard used by Massachusetts courts in the interpretation of chapter 151B, *Matthews v. Ocean Spray Cranberries, Inc.,* 426 Mass. 122, 686 N.E.2d 1303, 1309 (1997); *Blare v. Husky Injection Molding Sys. Boston, Inc.,* 646 N.E.2d at 116–17, and the so-called "pretext plus" federal standard. *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 524, 113 S.Ct. 2742, 2756, 125 L.Ed.2d 407 (1993). Given the paucity of evidence that Genesis' rationale for firing Plaintiff resulted from anything other than Plaintiff's own misconduct, the court will allow summary judgment on the retaliation counts, Counts III and IV.

### B. Individual Defendants' Motion For Summary Judgment

Plaintiff's claims of personal liability against each of the three supervisors—for retaliation (Counts V, VII, IX, XI, XIII and XV) and for aiding and abetting sexual harassment (Counts VI, VII [sic], X, XII, XIV, and XVI)—can be dealt with in short order. Absent any discrimination or retaliation by Genesis, the Individual Defendants cannot be responsible under M.G.L. ch.

151B § 4(5) for aiding and abetting unlawful discrimination that simply did not exist. *See Ruffino,* 908 F.Supp. at 1048. At an equally rudimentary level, the Individual Defendants cannot be liable under the state statute because Plaintiff, by her own account, never complained of any harassment to them and has failed to present any genuine or material evidence that they were otherwise aware of such harassment.

The court need not address the more thorny issue of personal liability in Title VII claims. Defendants contend that Title VII was not designed to impose personal liability on supervisors or co-workers. This assertion, however, is a far greater generalization than can be supported by the state of the law in this jurisdiction. *See Ruffino,* 908 F.Supp. at 1047–48. *But see Chatman v. Gentle Dental Ctr. of Waltham,* 973 F.Supp. 228, 236–37 (D.Mass.1997). The First Circuit has explicitly declined to resolve the issue. *Morrison,* 108 F.3d at 444. *Cf. Serapion v. Martinez,* 119 F.3d 982 (1st Cir.1997). However, even if such personal liability could be imposed under Title VII, it cannot be imposed in this case for all the reasons described with respect to M.G.L. ch. 151B. Accordingly, the court will allow summary judgment on all counts against the Individual Defendants, Counts V through XVI.

### IV. CONCLUSION

For the foregoing reasons the court will allow Defendants' motions for summary judgment.