David BENNETT, Plaintiff, Appellant,

v.

SAINT–GOBAIN CORPORATION et al., Defendants, Appellees.

No. 07–1219.

United States Court of Appeals, First Circuit.

Heard Sept. 5, 2007.

Decided Nov. 2, 2007.

Michael J. Michaeles, for appellant.

Hope A. Comisky, with whom Amy G. McAndrew, Pepper Hamilton LLP, James B. Conroy, Jill Brenner Meixel, and Donnelly, Conroy & Gelhaar, LLP were on brief, for appellees.

Before BOUDIN, Chief Judge, SELYA, Senior Circuit Judge, and SCHWARZER,* Senior District Judge.

SELYA, Senior Circuit Judge.

This is an employment discrimination action brought by plaintiff-appellant David Bennett against his quondam employer, Saint–Gobain Corporation, and two of its executives, John R. Mesher and Timothy L. Feagans. The district court entered summary judgment in favor of all the defendants.

In this appeal, the plaintiff assigns three broad categories of error. First, he asserts that the district court improperly excluded certain evidence that he proffered at the summary judgment stage. Second, he asserts that the court erred in determining that he failed to raise genuine issues of material fact sufficient to ward off brevis disposition on one or more of his causes of action. Third, he asserts that the court should not have disregarded a further evidentiary proffer made in connection with his motion for reconsideration of the summary judgment order. Discerning neither an error of law nor an abuse of discretion, we affirm the judgment below.

## I. BACKGROUND

The district court aptly summarized the facts of the case and the history of the relationships among the protagonists. *See Bennett v. Saint–Gobain Corp.,* 453 F.Supp.2d 314, 318–23 (D.Mass.2006). We assume the reader's familiarity with that exegetic account and, accordingly, rehearse here only the essence of what transpired. We supplement that recital in our later discussion of the issues on appeal.

The plaintiff was hired by Saint–Gobain's predecessor-in-interest as a patent attorney in 1989. When Saint–Gobain acquired the predecessor, he remained aboard. In 1999, he began reporting to Feagans, the company's deputy general counsel. Like the plaintiff, Feagans was based at the company's plant in Worcester, Massachusetts. Feagans reported to Mesher, the general counsel, who worked at the company's United States headquarters in Valley Forge, Pennsylvania.

The plaintiff proved to be a competent attorney. He nevertheless had trouble interacting with management. On several occasions, supervisors spoke to him about his attitude and demeanor. In addition, Mesher, Feagans, and other company personnel exchanged emails at various times regarding the plaintiff's conduct.

In June of 2001, the plaintiff—then sixty-two years old—joined with other members of the law department's intellectual property (IP) group to file internal age discrimination grievances against Feagans. The grievances included references to statements allegedly made by Feagans to the effect that he wanted to get rid of older members of the group. Such a statement allegedly was made to one of the grievants, Mary Porter.

The company took the grievances seriously; the vice-president for human resources undertook an investigation. He met with the complainants, interviewed employees, and reviewed written documentation related to the grievances. After concluding this limited probe, he found that a formal investigation was unwarranted and recommended that the company

* Of the Northern District of California, sitting by designation.

dismiss the grievances as unfounded. That was the end of the matter.

According to Saint–Gobain, the plaintiff thereafter engaged in various acts of insubordination. Yet, in 2002, he earned a higher performance rating than in the previous year and was rewarded with a salary increase.

In September of 2002, Mesher—without consulting Feagans—announced plans to close the law department's Worcester satellite operation and move those jobs to Valley Forge. He gave the staff in Worcester the option either of migrating or of accepting a generous severance package. Within a month, however, Mesher reversed his field; he abandoned the consolidation plan and rescinded the special severance offer.

On or about October 25, the plaintiff for the first time expressed an interest in accepting the special severance package. Since the offer had been withdrawn three weeks earlier, his interest went unrequited.

For reasons that shortly will become apparent, we turn for a moment to the plight of another Saint–Gobain employee, Diana Henchey. Between the fall of 2001 and the fall of 2002, Henchey on four occasions reported receiving anonymous, sexually tinged poems while at work. The poems were both unwanted and discomforting. The company reasonably concluded that this harassment was in all probability the work of a fellow employee.

The poems themselves offered a clue to the author's identity: certain words were spelled in a distinctively "British" fashion. Based on that fact and on her short encounters with the plaintiff (who is British), Henchey suspected that he might be the anonymous poet. She voiced this suspicion to the company.

At that point, the human resources office contacted Robert Wilk, an employee in the company's security department. Wilk conducted an investigation and retained an outside handwriting expert to assist in determining authorship. Wilk kept Mesher apprised of the status of the probe.

In due course, the handwriting expert concluded that it was "highly probable" that the plaintiff had written the poems. When notified of the expert's opinion, Mesher contacted Feagans. He told Feagans that he wanted to make sure that the plaintiff would be available for a meeting in Worcester on a day certain. He did not say why. Without knowing the purpose of the meeting, Feagans ensured the plaintiff's availability.

The meeting took place on October 31, 2002. Wilk, the plaintiff, and an outside consultant were in attendance. The plaintiff was asked whether he had written the poems. He not only denied their authorship but also denied that he had ever composed any poems. However, a search of the plaintiff's office revealed copies of other poems that he had written.

At one point during the session, the plaintiff was asked to spell "meager"—a word that appeared, spelled m-e-a-g-r-e, in one of the poems sent to Henchey. The plaintiff complied. He used the same distinctively "British" spelling that the poet had used.

Wilk advised Mesher of the results of the interview and search. Mesher concluded that the plaintiff had sent the poems and decided to discharge him. There is no evidence that Mesher consulted Feagans with respect to this decision.

Following his discharge, the plaintiff sued. He alleged, among other things, age discrimination, retaliation, aiding and abetting, and tortious interference with contractual relations. In due season, the de-

fendants moved for summary judgment. The district court granted the motion, *see Bennett*, 453 F.Supp.2d at 333, and thereafter denied the plaintiff's motion for reconsideration. This timely appeal ensued.

## II. DISCUSSION

We begin our trek through the record with the preliminary question of whether the lower court acted appropriately in rejecting certain evidence that the plaintiff sought to have considered on summary judgment. We then address the court's summary judgment ruling, subdividing that discussion into four segments to correspond with the four causes of action pressed by the plaintiff at the hearing on summary judgment. Finally, we deal with the denial of the motion for reconsideration.

### A. *The Evidentiary Proffer.*

At the summary judgment hearing, the district court ruled inadmissible statements contained in the internal age discrimination grievances filed by members of the IP group. These unsworn grievances referenced age-discriminatory remarks allegedly made by Feagans to Porter and another co-worker (who recounted them to Porter). The district court ruled that the unsworn grievances constituted inadmissible hearsay. *Bennett*, 453 F.Supp.2d at 324–25 (citing *Cloutier v. Costco Wholesale Corp.*, 390 F.3d 126, 137 (1st Cir.2004)). The plaintiff argues that the court improperly excluded this evidence both because the defendants admitted that the grievances had been filed and because the crucial statements fall within any of several possible exceptions to or exclusions from the hearsay rule. In that regard, he mentions the exclusion for prior inconsistent statements, Fed.R.Evid. 801(d)(1); the exclusion for admissions by a party-opponent, *id.* 801(d)(2)(A); the exclusion for

admissions by an employer's agent acting within the scope of employment, *id.* 801(d)(2)(D); and the exception for statements concerning state of mind, *id.* 803(3). He also mentions the exceptions for business records, *id.* 803(6), and for operative facts, *id.* 807. He also makes a curious argument that Feagans's alleged comment is not offered for the truth of the matter asserted (in which event it would fall outside the hearsay definition altogether, *see id.* 801(c)).

We review claims relating to the admission or exclusion of evidence for abuse of discretion. *See United States v. Brown*, 500 F.3d 48, 58 (1st Cir.2007); *Torres–Arroyo v. Rullán*, 436 F.3d 1, 7 (1st Cir.2006). That same abuse-of-discretion standard applies to a district court's decision to admit or exclude evidence at the summary judgment stage. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 143, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997); *Orta–Castro v. Merck, Sharp & Dohme Química P.R., Inc.*, 447 F.3d 105, 110 (1st Cir.2006).

The plaintiff's initial argument assumes too much. Although the defendants admitted that the grievances were in fact filed, that admission does not equate to an admission that Feagans made the statements attributed to him in the grievances. As the plaintiff acknowledges, *see* Appellant's Br. at 27, the defendants consistently have denied that any such comments were made.

Our decision in *Dávila v. Corporación De Puerto Rico Para La Difusión Pública*, 498 F.3d 9 (1st Cir.2007), largely disposes of the plaintiff's next argument. There, the plaintiff relied on an affidavit stating that others had told him that his supervisor considered him too old for his job. *Id.* at 17. But the plaintiff did not offer an affidavit from any person who actually had heard the alleged statement.

Given this omission, we ruled that the statement was hearsay under Federal Rule of Evidence 801(c) and reiterated that "[i]t is black-letter law that hearsay evidence cannot be considered on summary judgment." *Dávila,* 498 F.3d at 17.

The scenario here demands the same result. The plaintiff had no first-hand knowledge of Feagans's alleged remarks, nor did he tender an affidavit from Porter or any other percipient witness attesting to them. Thus, the comments attributed to Feagans in Porter's grievance were hearsay.

The plaintiff's sundry attempts to avoid the hearsay bar do not call for a different result. Indeed, because Porter's grievance was unsworn, her narrative about Feagans's comments comprised hearsay within hearsay and, thus, confronted a doubled hearsay bar. *See* Fed.R.Evid. 805; *see, e.g., United States v. Patrick,* 248 F.3d 11, 22 (1st Cir.2001).

The plaintiff's efforts either to characterize these comments as nonhearsay or to fit them into a hearsay exception are unavailing. While the plaintiff lists a litany of hearsay exceptions and exclusions, most of these references are unaccompanied by developed argumentation and, accordingly, need not be addressed. *See United States v. Zannino,* 895 F.2d 1, 17 (1st Cir.1990). The remainder are easily dispatched. *See, e.g., United States v. Millán,* 230 F.3d 431, 438 (1st Cir.2000) (holding statement inadmissible under state-of-mind exception to hearsay rule absent proof of personal knowledge); *Ricciardi v. Children's Hosp. Med. Ctr.,* 811 F.2d 18, 22 (1st Cir.1987) (requiring a showing of personal knowledge before evidence may be admitted under the business records exception to the hearsay rule). And, finally, the plaintiff never explains how the admission of the grievances other than for the truth of the matter asserted would advance his cause.

We add, moreover, that even if the grievances did not comprise hearsay, they would not have had a decisive bearing on the issues before the district court. After all, Feagans was not the decisionmaker here. Thus, whether or not he made discriminatory comments would not have affected the outcome (which turned on whether Mesher—the person responsible for the decision to terminate the plaintiff's employment—acted out of a discriminatory animus). Put another way, since Feagans had no part in the adverse employment decision, his comments, even if made, would constitute nothing more than stray remarks. As such, they would be insufficient to block summary judgment. *See, e.g., Ramírez Rodríguez v. Boehringer Ingelheim Pharms., Inc.,* 425 F.3d 67, 84 (1st Cir.2005) (holding stray remarks by nondecisionmakers insufficient to prove pretext); *Rivera–Aponte v. Rest. Metropol # 3, Inc.,* 338 F.3d 9, 12 (1st Cir.2003) (similar); *González v. El Día, Inc.,* 304 F.3d 63, 69 (1st Cir.2002) (similar).

### B. *The Age Discrimination Claims.*

Having demarcated the boundaries of the summary judgment record, we turn next to the district court's disposition of the plaintiff's age discrimination claims. We review de novo a district court's entry of summary judgment. *Iverson v. City of Boston,* 452 F.3d 94, 98 (1st Cir.2006). In conducting that tamisage, we consider the evidence in the light most congenial to the nonmoving party (here, the plaintiff) and draw all reasonable inferences in that party's favor. *Id.* If—and only if—the record, viewed in that light, discloses no genuine issue as to any material fact and reveals that the movant is entitled to judgment as a matter of law, we will affirm the summary judgment order. *See* Fed.R.Civ.P. 56(c).

In an employment discrimination case, a plaintiff's ability to survive summary judgment depends on his ability to muster facts sufficient to support an inference of discrimination. He cannot rely exclusively on bald assertions, unsupported conclusions, or optimistic surmises. *See Medina–Muñoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir.1990). Where, as here, the nonmovant-plaintiff has the burden of proof, the evidence adduced on each of the elements of his asserted cause of action must be significantly probative in order to forestall summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Dávila*, 498 F.3d at 12.

In this instance, the plaintiff brought age discrimination claims against Saint–Gobain under both the federal Age Discrimination in Employment Act of 1967 (ADEA), 29 U.S.C. §§ 621–624, and a counterpart state anti-discrimination statute, Mass. Gen. Laws ch. 151B, § 4(1B). The tests under these two sets of statutes are substantially similar [2] and in all events, the plaintiff has relied upon a unitary standard. Thus, we set out the ADEA paradigm with the understanding that, for present purposes, that paradigm applies to all of the plaintiff's age discrimination claims.

■ Under the ADEA, an employer is prohibited from taking an adverse employment action against an employee who is forty years of age or older because of the latter's age. *See* 29 U.S.C. §§ 623(a)(1), 631(a). When no direct proof of discrimination exists, the employee may rely on circumstantial evidence to prove

discrimination. *See Dávila*, 498 F.3d at 15. A prima facie case of discrimination may be established through the by-now-familiar burden-shifting framework first limned by the Supreme Court. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

An employee who claims to have been cashiered in violation of the ADEA must carry the ultimate "burden of proving that his years were the determinative factor in his discharge, that is, that he would not have been fired but for his age." *Mesnick v. Gen. Elec. Co.*, 950 F.2d 816, 823 (1st Cir.1991) (quoting *Freeman v. Package Mach. Co.*, 865 F.2d 1331, 1335 (1st Cir. 1988)). The burden-shifting framework may help an employee to carry this burden.

■ That framework requires the employee, in the first instance, to make out a prima facie case. To accomplish this modest task, the plaintiff must adduce evidence showing four facts: (i) that he is a member of the protected group; that is, that he was at least forty years of age when dismissed from his employment; (ii) that his job performance met or exceeded his employer's legitimate expectations; (iii) that his employer actually or constructively discharged him; and (iv) that his employer had a continuing need for the services that he had been rendering. *See Dávila*, 498 F.3d at 15; *Velázquez–Fernández v. NCE Foods, Inc.*, 476 F.3d 6, 11 (1st Cir.2007).

Once the plaintiff makes out his prima facie case, the burden of production (but not the burden of proof) shifts to the defendant to articulate a legitimate, nondis-

---

**2.** Massachusetts age discrimination law deviates from federal law in at least one respect: it allows a plaintiff who establishes a prima facie case and "proves that at least one of the reasons given by the defendant was pretextual" to survive a motion for judgment as a

matter of law. *Joyal v. Hasbro, Inc.*, 380 F.3d 14, 17 (1st Cir.2004). Because the plaintiff here has failed to present sufficient evidence of pretext, *see* text *infra*, this distinction makes no difference for our purposes.

criminatory reason for the dismissal. *See Mesnick,* 950 F.2d at 823. If and when the defendant satisfies its burden of production, the plaintiff no longer can rest on the initial inference of discrimination but, rather, must show that the defendant's articulated reason is pretextual. *See Dávila,* 498 F.3d at 16; *Mesnick,* 950 F.2d at 823. "At summary judgment, this question reduces to whether or not the plaintiff has adduced minimally sufficient evidence to permit a reasonable factfinder to conclude that he was fired because of his age." *Dávila,* 498 F.3d at 16.

▉ Actionable discrimination cannot exist in a vacuum. Rather, the discriminatory intent of which a plaintiff complains must be traceable to the person or persons who made the decision to fire him. *See Velázquez–Fernández,* 476 F.3d at 11; *Medina–Muñoz,* 896 F.2d at 10.

In this instance, the parties agree that the plaintiff made out his prima facie case. They also agree that Saint–Gobain articulated a legitimate nondiscriminatory reason for terminating the plaintiff's employment: a belief that he had authored the harassing poems, transmitted them to Henchey, and lied about it when confronted. The crux of the parties' dispute on the age discrimination claims is whether the plaintiff adduced any significantly probative evidence of pretext. We think he has not.

▉ When assessing a claim of pretext in an employment discrimination case, an inquiring court must focus on the motivations and perceptions of the actual decisionmaker. *Dávila,* 498 F.3d at 16. Statements made by those who are not involved in the decisional process "normally are insufficient, standing alone, to establish either pretext or the requisite discriminatory animus." *Velázquez–Fernández,*

476 F.3d at 11–12 (internal citation omitted).

▉ In the absence of some other proof that the decisionmaker harbored a discriminatory animus, it is not enough that his perception may have been incorrect. *See Dávila,* 498 F.3d at 17; *Mesnick,* 950 F.2d at 825. Rather, the plaintiff must show that the decisionmaker did not believe in the accuracy of the reason given. *Ronda Pérez v. Banco Bilbao Vizcaya Argentaria,* 404 F.3d 42, 45 (1st Cir.2005); *Gray v. New Engl. Tel. & Tel. Co.,* 792 F.2d 251, 256 (1st Cir.1986).

▉ The plaintiff's argument runs afoul of these tenets. His evidentiary proffer centers on a discriminatory animus that he attributes to Feagans. That proffer does not take the plaintiff very far; what is conspicuously missing is evidence either that Feagans had something to do with the discharge decision or that Mesher—the actual decisionmaker—shared Feagans's sentiments. For aught that appears, Mesher made the decision to fire the plaintiff based on Wilk's investigation and without ever consulting Feagans.

To be sure, the plaintiff speculates that Mesher must have been influenced by his subordinate. But conjecture cannot take the place of proof in the summary judgment calculus. *See Medina–Muñoz,* 896 F.2d at 8. Nothing in the record supports an inference of complicity. Indeed, the record reveals that Feagans was deliberately kept in the dark about the purpose of the climactic October 31 meeting.

The plaintiff has a second string to his bow. He attempts to persuade us that he did not compose the poems. That issue is largely beside the point: what counts is whether the decisionmaker—Mesher—*believed* the plaintiff to be the author and, if so, whether he acted on that belief in deciding to send the plaintiff packing.[3]

---

**3.** At the risk of carting coal to Newcastle, we

add that Mesher's belief was reasonable on its

*See, e.g., Dávila,* 498 F.3d at 17; *Ronda Pérez,* 404 F.3d at 46. Here, the plaintiff offered no evidence to show that Mesher believed that the poems were written by someone else.

The short of it is that courts, in employment discrimination cases, may not act as "super personnel departments," substituting their judicial judgments for the business judgments of employers. *Mesnick,* 950 F.2d at 825. In the absence of any evidence that an employer's decision was pretextual or motivated by discriminatory intent, a court has no right to supersede that decision. Because this is such a case, we uphold the district court's entry of summary judgment on the plaintiff's age discrimination claims.

## C.  *The Retaliation Claims.*

██ As an alternate theory, the plaintiff asserts that Saint–Gobain unlawfully retaliated against him in violation of both the ADEA, 29 U.S.C. § 623(d), and state law, Mass. Gen. Laws ch. 151B, § 4(4), by terminating his employment because he had filed an internal age-related grievance against Feagans. In order to establish a prima facie case of retaliation, an employee must show that he engaged in a protected activity and that he suffered an adverse employment action as a result of his participation in that activity. *See Ramírez Rodríguez,* 425 F.3d at 84; *MacCormack v. Boston Edison Co.,* 423 Mass. 652, 672 N.E.2d 1, 7–8 (1996). At a bare minimum, this requires an employee to make a colorable showing of a causal connection between his protected activity (here, the filing of the grievance) and the adverse employment action (here, the dismissal).

The plaintiff has failed to cross that threshold.

██ As explained above, the grievance filed by the plaintiff was directed at Feagans, not Mesher. Feagans was at best a mid-echelon manager, and the plaintiff has offered nothing that would ground a reasonable inference that either Mesher or the company would be moved to retaliate on Feagans's behalf.

Here, moreover, sixteen months passed between the filing of the grievance and the plaintiff's subsequent ouster. This temporal gap is sufficiently large so that, without some corroborative evidence, it will not support an inferred notion of a causal connection between the two. See, *e.g., Bishop v. Bell Atl. Corp.,* 299 F.3d 53, 60 (1st Cir.2002) (finding one-year gap between protected activity and adverse employment action insufficient to support a reasonable inference of causation); *Mesnick,* 950 F.2d at 828 (holding that a time lapse of nine months between the filing of a formal grievance and the adverse employment action undercut any inference of causation).

We add that what evidence does exist is not corroborative of, but tends to refute, an inference of retaliation. For example, any suggestion of a connection between the grievance and the plaintiff's ouster is undermined by the fact that the plaintiff received a more favorable performance review in the year after he filed the grievance than in the year preceding the filing. Along the same line, he also received a raise. Logically, such positive developments cut against any plausible inference of retaliation.[4] See, *e.g., Freadman v.*

face given Henchey's own suspicions, the handwriting expert's findings, the distinctively "British" spelling of words in the poems, the plaintiff's use of the same "British" spelling when asked to spell one of the words during his interview, and the discovery in the

plaintiff's office of other poems that he had composed.

4.  The plaintiff cites two other events as "evidence" of retaliation and/or discrimination. First, he points to the denial of his request for

*Metro. Prop. & Cas. Ins. Co.*, 484 F.3d 91, 101 (1st Cir.2007) (finding interim salary increase and improved performance review, among other facts, sufficient to break causal chain as to retaliation claim); *cf. Houser v. Sears, Roebuck & Co.*, 627 F.2d 756, 759 (5th Cir.1980) (finding no age discrimination when employee was promoted just days before being discharged for violating company policies).

### D. *The Aiding and Abetting Claims.*

■■■■ In addition to his claims against his employer, the plaintiff trains his sights on Mesher and Feagans. He asserts that they transgressed a Massachusetts anti-discrimination statute, Mass. Gen. Laws ch. 151B, § 4(5), by aiding and abetting Saint–Gobain in its unlawful age discrimination and retaliation.

We need not linger long over these claims. We agree with the district court, *Bennett*, 453 F.Supp.2d at 331, 333, that because the age discrimination and retaliation claims were appropriately resolved in Saint–Gobain's favor, *see supra* Parts II(B)-(C), the attendant aiding and abetting claims necessarily fail. *See Beasley v. ARAMARK Unif. & Career Apparel, Inc.*, 430 F.Supp.2d 8, 14 (D.Mass.2006); *Ligenza v. Genesis Health Ventures of Mass., Inc.*, 995 F.Supp. 226, 233 (D.Mass.1998). After all, it stands to reason that one cannot aid or abet a wrong that never occurred.

### E. *The Tortious Interference Claims.*

The plaintiff further asserts that Mesher and Feagans tortiously interfered with ad-

vantageous contractual relations (specifically, his employment).[5] These are common-law claims cognizable under state law. *See, e.g., Blackstone v. Cashman*, 448 Mass. 255, 860 N.E.2d 7, 12–13 (2007); *Bray v. Cmty. Newsp. Co.*, 67 Mass.App. Ct. 42, 851 N.E.2d 1087, 1092 (2006).

■■■■ To survive a motion for summary judgment on such a claim, a plaintiff must make out a genuine issue of material fact with respect to each of the elements of the tort. Under Massachusetts law, the elements of the tort, in the employment context, are (i) the existence of a business relationship between the plaintiff and a third party, (ii) of which the defendant is aware and (iii) with which he intentionally and improperly interferes, (iv) causing an impairment of the business relationship, to the plaintiff's detriment. *See Zimmerman v. Direct Fed. Credit Union*, 262 F.3d 70, 76 (1st Cir.2001) (applying Massachusetts law). In this context, actual malice must be shown to prove improper motive or means. *Blackstone*, 860 N.E.2d at 13. To establish that element of the tort, the plaintiff must show more than garden-variety hostility or personal incompatibility. *See Zimmerman*, 262 F.3d at 76; *King v. Driscoll*, 418 Mass. 576, 638 N.E.2d 488, 495 (1994). In addition, malice must have been more than a mere concomitant of the parties' relationship; it must have been the "controlling factor" in the offending conduct. *Zimmerman*, 262 F.3d at 76.

■■■■ In this case, it is undisputed that the plaintiff had a business relationship

---

the special severance package, *see* text *supra*—but he overlooks the uncontradicted evidence that the company's offer had been withdrawn well before he expressed an interest in it. Second, he notes that the company apparently monitored his expense receipts with considerable vigor. But he cites no disallowance of legitimate expenses, and we hardly think that an employer can be subjected to

liability because it tries to ensure that employees' expense accounts toe the line.

**5.** As both logic and the case law dictate, the employer cannot be held liable for tortious interference with its own contracts of employment. *Zimmerman v. Direct Fed. Credit Union*, 262 F.3d 70, 76 (1st Cir.2001).

with Saint–Gobain, that Mesher and Feagans knew as much, and that Mesher's actions in terminating the plaintiff's employment disrupted that relationship and caused the plaintiff harm. Feagans took no action in that regard, so the claim against him is a work of fiction. This leaves only the claim against Mesher.

That claim dissolves when scrutinized. The plaintiff simply has not pointed to *any* evidentiary predicate on which a rational jury could find that Mesher acted with malice in discharging him. Even when viewed in the light most favorable to the plaintiff, the record shows that Mesher acted strictly and solely out of a reasonable belief that the plaintiff had composed the harassing poems and delivered them to Henchey. The fact that an employer may have breathed a sigh of relief when showing the door to a gadfly or a nettlesome employee does not transform a founded dismissal into a malicious act. *See Gram v. Liberty Mut. Ins. Co.*, 384 Mass. 659, 429 N.E.2d 21, 25 (1981) (holding supervisor's dislike of employee insufficient to support a finding of malice); *cf. Mesnick*, 950 F.2d at 828 (finding evidence that employer may have been glad to relieve itself of employee's bad behavior did not translate into evidence of age-related animus for purposes of discrimination claim).

For these reasons, we conclude that the plaintiff's claims for tortious interference with contractual relations were properly disposed of by summary judgment.

### F. *The Motion for Reconsideration.*

The plaintiff's last remaining assignment of error concerns the district court's denial of his motion to reconsider the entry of summary judgment. We review a district court's decision on such a motion for abuse of discretion. *DiMaio Family Pizza & Lunch., Inc. v. Charter Oak Fire Ins. Co.*, 448 F.3d 460, 462 (1st Cir.2006); *Rodríguez v. Fullerton Tires Corp.*, 115 F.3d 81, 86 (1st Cir.1997).

The relevant facts are as follows. After the district court granted the defendants' motion for summary judgment, the plaintiff tried to salvage his case by submitting additional evidence on a motion for reconsideration. These submissions comprised (i) an affidavit from Porter attesting that Feagans had stated to her that he wanted to be rid of older members of the IP group and (ii) a supplemental affidavit from the plaintiff himself, in which he attempted to show why he could not have sent the unwanted poems to Henchey.

The district court denied the motion, concluding that the affidavits did not constitute newly discovered evidence and, at any rate, did not undermine the summary judgment order. *Bennett v. Saint–Gobain Corp.*, Civ. No. 04–40014 (D.Mass. Oct. 26, 2006) (unpublished order denying motion for reconsideration). Relatedly, the court noted that the plaintiff's stated reasons for withholding the evidence—tactical considerations and fear of fomenting adverse employment consequences for Porter—did not qualify the evidence as newly discovered. *Id.* at 1–2.

Of course, newly discovered evidence sometimes may constitute a valid basis for a successful motion for reconsideration. *See Int'l Strategies Group, Ltd. v. Greenberg Traurig, LLP*, 482 F.3d 1, 6 (1st Cir.2007); *Palmer v. Champion Mortg.*, 465 F.3d 24, 30 (1st Cir.2006). But evidence known to a party and deliberately withheld for tactical reasons cannot plausibly be counted as newly discovered. *See, e.g., Willens v. Univ. of Mass.*, 570 F.2d 403, 406 (1st Cir.1978).

In this case, it is clear from the plaintiff's own admissions that the additional evidence was merely newly proffered, not newly discovered. Thus, the district court

did not abuse its discretion in rejecting the plaintiff's neoteric submissions.

We add a coda. With or without considering the additional evidence, we find no error in the entry of summary judgment. As recounted earlier, the district court's analysis of the plaintiff's claims tracked applicable precedent. The additional evidence went to peripheral matters. For one thing, Mesher's animus was at issue, not Feagans's animus. *See supra* Part II(B)-(C). For another thing, the case hinged on the sincerity and reasonableness of Mesher's stated belief that the plaintiff was responsible for the unwanted poems. *See Dávila,* 498 F.3d at 16–17 ("[A] court's focus is necessarily on the motivations and perceptions of the decisionmaker" and "as long as the [decisionmaker] believed that the appellant's performance was not up to snuff ... it is not our province to second-guess a decision to fire him"). The plaintiff's supplementary affidavit, however, went only to the *accuracy* of that belief.

There is no point in flogging a moribund mare. We hold, first, that the district court acted appropriately in refusing to consider the plaintiff's belated submissions. We hold, as an alternate ground, that the belatedly submitted evidence would not have affected the bottom-line result. Consequently, the district court did not abuse its discretion in denying the motion for reconsideration.

## III. CONCLUSION

We need go no further. For the reasons elucidated above, we uphold the district court's decision and judgment.

*Affirmed.*