Myriam GÓMEZ–GONZÁLEZ, et al, Plaintiffs,

v.

**RURAL OPPORTUNITIES, INC., Defendant.**

**Civil No. 06–1343 (ADC).**

United States District Court, D. Puerto Rico.

Sept. 30, 2009.

Erick Morales–Perez, Erick Morales Law Office, Carolina, PR, for Plaintiffs.

Radames A. Torruella–Del–Valle, McConnell Valdes, San Juan, PR, for Plaintiffs and Defendant.

Jessica A. Figueroa–Arce, McConnell Valdes, San Juan, PR, for Defendant.

## OPINION AND ORDER

AIDA M. DELGADO–COLON, District Judge.

Plaintiffs, Myriam Gómez–González ("Gómez"), Gerardo Arribas–Rivera ("Arribas"), and their Conjugal Partnership (collectively, "plaintiffs"), bring suit against defendant, Rural Opportunities, Inc. ("ROI" or "defendant"), alleging, *inter alia*, that she was discriminated against due to age, sex, and disability. Plaintiff also alleges she was unjustly terminated from her employment on account of the same. Gómez invokes the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*; the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12112 *et seq.*; Title VII of the Civil Rights Act of 1964, 42 U.S.C. section 2000e *et seq.*; wrongful discharge under Commonwealth of Puerto Rico ("Commonwealth")Act No. 80 of May 30, 1976, as amended, P.R. Laws Ann, tit. 29, § 185a *et seq.*; Commonwealth Act No. 44 of June 2, 1985, as amended, P.R. Laws Ann, tit. 1, § 501 *et. seq.*; Commonwealth Act No. 100 of June 30, 1959, as amended, P.R. Laws Ann, tit. 29, § 146, *et seq.*; Puerto Rico Act No. 69 of July 6, 1985, as amended, 29 L.P.R.A. § 1321 *et seq.*; and, recovery of plan benefits pursuant to the Employment Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132(a)(1)(B). Further, Arribas claims damages pursuant to the Commonwealth's general tort statutes. **Docket No. 3.**

Now before the court is defendant's motion for summary judgment, statement of uncontested facts, reply statement and reply brief as well as plaintiffs' opposition to defendant's summary judgment and memorandum in support thereof, and response to defendant's statement of facts. **Docket Nos. 33[1], 34, 37, 38, 47, 48.** At issue is whether plaintiffs' allegations and proffered evidence support causes of action for age, sex and disability discrimination and ERISA violations.

## I. Factual Background

Unless otherwise noted, the following relevant facts are derived from defendant's statement of facts and plaintiffs' responses. **Docket Nos. 30, 33.[2]** Consistent with the summary judgment standard, the court states the facts in the light most favorable to plaintiff, the nonmoving party. *See Iverson v. City of Boston,* 452 F.3d 94, 98 (1st Cir.2006).

ROI is a private, non-profit regional community development and human service organization that, since 1969, provides services to farm workers, low-income families and economically depressed communities throughout different states of the

---

1. Along with its filing of the summary judgment documents, defendant requested leave to file an extended summary judgment brief. **Docket No. 35.** The court granted the leave sought. **Docket No. 40.**

2. After conducting a thorough review of plaintiffs' response to defendant's statement of uncontested material facts **(Docket No. 38),** the court finds that plaintiff failed to properly contest the vast majority of defendant's statements of fact. Plaintiffs' denials and qualifications are either irrelevant to the matter at hand, add facts that should have been filed in a separate statement, or consist of mere "speculation, generalities, conclusory assertions, improbable inferences, and, for lack of a better phrase, a lot of 'hot air.'" *Dominguez v. Eli Lilly and Co.,* 958 F.Supp. 721, 738 (D.P.R.1997). Consequently, the court will cull most of the relevant facts from defendant's statement.

United States of America and Puerto Rico. **Docket No. 34, at ¶ 1; Docket No. 38, at ¶ 1.** ROI is organized under the laws of New York, with its principal offices in Rochester, New York and is authorized to do business in the Commonwealth of Puerto Rico. **Docket No. 34, at ¶ 2; Docket No. 38, at ¶ 2.** ROI's local offices are located at Adjuntas, Puerto Rico. **Docket No. 34, at ¶ 3; Docket No. 38, at ¶ 3.** ROI operates a wide array of programs funded by federal, state, local, faith-based and private sources, including Real Estate Development, Housing Services, Housing Rehabilitation, Youth Education and Training, Volunteer Initiatives and Low Income Tax Clinic. **Docket No. 34, at ¶ 4; Docket No. 38, at ¶ 3.**

Stuart Mitchell ("Mitchell"), ROI's President and CEO, was born on February 14, 1944, and is 64 years old. **Docket No. 34, at ¶ 5; Docket No. 38, at ¶ 5.** Lee Beaulac ("Beaulac"), Senior Vice President of Community and Economic Development and Gómez' immediate supervisor, was born on June 16, 1947, and is 61 years old. **Docket No. 34, at ¶ 6.** Keith Scholes ("Scholes"), Senior Program Director of Housing Resource Development, was born on January 14, 1948, and is 61 years old. **Docket No. 34, at ¶ 7.** Mary Hanson ("Hanson"), ROI's late Senior Vice–President of Human Resources, was born on March 6, 1948, and was 51 years old at the time Gómez was hired. **Docket No. 34, at ¶ 8.** Jay Golden ("Golden"), ROI's former Senior Director of Real Estate Development, was born on January 9, 1938, and is 71 years old. **Docket No. 34, at ¶ 9.** Roger Hernández ("Hernández"), ROI's Director of Housing Development for the Puerto Rico division, was born on February 2, 1958, and is 51 years old. **Docket No. 34, at ¶ 10.** Gómez was born on May 16, 1950, and is 58 years old. **Docket No. 34, at ¶ 11; Docket No. 38, at ¶ 11.** Arribas was born on April 28, 1956, and is 52 years old. **Docket No. 34, at ¶ 12; Docket No. 38, at ¶ 12.**

## A. Gómez' Employment with ROI

ROI was looking for a Director of its Puerto Rico operations. Gómez was assisting them in finding a candidate. During that process, Beaulac approached Gómez and asked her to take the position. **Docket No. 34, at ¶ 13; Docket No. 38, at ¶ 13.** ROI hired Gómez as the State Director of ROI's Puerto Rico operations on November 2, 1999. **Docket No. 34, at ¶ 14; Docket No. 38, at ¶ 14.** Gómez was 49 years old when hired. **Docket No. 34, at ¶ 15; Docket No. 38, at ¶ 15.**

As ROI's State Director in Puerto Rico, Gómez was responsible for everything that related to the supervision and management of ROI's programs in Puerto Rico. Some of Gómez' major responsibilities and duties included: (I) program coordinating with local municipalities, marketing, business development, employee supervision; (ii) real estate development, identifying sites for real estate development, home ownership, lending, community development; (iii) meeting the goals for ROI's programs in Puerto Rico, as approved by her direct supervisors and by ROI's Board of Directors; (iv) submitting written progress reports; (v) participating in regular weekly telephone calls with her immediate supervisor and ROI's Rochester-based executive staff; (vi) keeping her immediate supervisor and ROI's Rochester-based executive staff informed on ongoing activities in Puerto Rico; (vii) project/program management, defining program objectives, developing the steps, methods and procedures for fulfilling those goals and assuring that the programs and projects complied with all local, state and federal regulations; (viii) identifying, defining and creating programs to meet given

problems or objectives, and to identify and recommend solutions for solving organizational programmatic problems or objectives; (ix) development of additional housing efforts and resources, which would impact farm workers, the homeless, single heads of household, and other rural sectors; and (x) assuring that all actions made at the Puerto Rico division level were consistent with organizational policy. **Docket No. 34**, at ¶ 16; **Docket No. 38**, at ¶ 16.

Approximately five (5) years after Gómez' hiring, on or about January 12, 2005, ROI's Executive Committee traveled to Puerto Rico to inspect the site of the development projects handled by Gómez. **Docket No. 34**, at ¶ 17; **Docket No. 38**, at ¶ 17. During the meeting with ROI's Executive Committee, Gómez agreed to attend a Program Review that Mitchell scheduled for February 2, 2005, at ROI's central offices in Rochester, New York. **Docket No. 34**, at ¶ 18; **Docket No. 38**, at ¶ 18. Gómez was aware that, during said Program Review, ROI's management was going to discuss and evaluate the different phases of the Puerto Rico operations. Gómez knew they were going to be making comments as to how effectively she was handling each one of the phases or areas of the Puerto Rico operations. **Docket No. 34**, at ¶ 19; **Docket No. 38**, at ¶ 19.

On or around January 19, 2005, Mitchell issued a memorandum providing notice to Gómez and others, regarding the specific purpose of the February 2, 2005, meeting in New York. The same was to discuss the results of an internal audit of the projects and programs in Puerto Rico. **Docket No. 34**, at ¶ 20; **Docket No. 38**, at ¶ 20. In preparation for this meeting, Mitchell asked Gómez, and each one of ROI's staff responsible for administering, supervising,

and providing technical assistance to Gómez and the Puerto Rico programs and projects, to prepare a comprehensive, detailed, and frank list of all the issues that they had related during the Committee's visit, as these related to their particular area of responsibility. Mitchell also directed them to include issues related to the overall strategy and technical issues regarding specific program and project operations. **Docket No. 34**, at ¶ 21; **Docket No. 38**, at ¶ 21. Mitchell informed Gómez that several of the issues raised or brought to his attention related to concerns with the communication, timeliness of program and project implementation, budget problems, need to establish priorities, competition between projects and programs, supervisory structure, and long term strategy. Prior to designing the agenda for the February 2, 2005 meeting, Mitchell asked everyone, including Gómez, for a very detailed list of their specific subjects of concern. **Docket No. 34**, at ¶ 22; **Docket No. 38**, at ¶ 22.

### B. The Rochester Meeting

On February 1, 2005, in Rochester, prior to the Program Review meeting, Mitchell handed Gómez a memorandum, dated January 27, 2005, which listed issues raised by the Rochester-based staff. This memorandum addressed concerns about Gómez' performance. **Docket No. 34**, at ¶ 23; **Docket No. 38**, at ¶ 23. Numerous people in Rochester had expressed concerns about Gómez' performance in Puerto Rico. **Docket No. 34**, at ¶ 25. Gómez denied the issues concerning her performance. **Docket No. 38**, at ¶ 23. All the issues contained in the January 27, 2005 memorandum were brought to Gómez' attention as well. **Docket No. 34**, at ¶ 24; **Docket No. 38**, at ¶ 24.[3] On February 2, 2005, the

---

**3.** Although plaintiffs deny this statement, no

record evidence has been cited to counter the

Program Review meeting was held with a frank and open discussion about all the performance issues raised and the need to develop a plan of action for the Puerto Rico operations. **Docket No. 34, at ¶ 26.**

Regarding Gómez' performance, it was brought to her attention that: i) there was poor communication with her subordinates and the Rochester office; ii) she did not voluntarily communicate with Rochester staff unless she was under pressure or urgently needed something; iii) she made decisions about the projects without consulting Rochester program managers; iv) Gómez missed many conference calls with ROI's central staff creating a gap of knowledge about her activities and programs; v) there had been complaints as to verbal abuse from Gómez and disrespect towards employees in the Puerto Rico division; vi) Gómez was difficult to get in touch with and unreachable; vii) ROI's interests were not being served well by the way Gómez prioritized her work and the programs suffered; viii) Gómez did not inspire or motivate staff to perform, but rather instilled anxiety and fear; ix) inability to attain program goals; x) serious difficulties with the three (3) real estate development projects; xi) complaints on supervisory style; and xii) overall failed management. **Docket No. 34, at ¶ 27; Docket No. 38, at ¶ 27.**

Gómez conceded that, as to productivity, the comments contained in the January 27, 2005, memorandum were an honest appreciation of certain deficiencies that her su-

pervisors saw in her work and the way that things were functioning in Puerto Rico. **Docket No. 34, at ¶ 28; Docket No. 38, at ¶ 28.** Gómez admitted that she was upset mostly because she felt that the issues expressed in the January 27, 2005, memorandum, in her opinion, were not expressed in a professional manner. **Docket No. 34, at ¶ 29; Docket No. 38, at ¶ 29.** During the Rochester meeting, Gómez had the opportunity to discuss the content of the January 27, 2005, memorandum, but opted not to because she felt embarrassed and she did not want to get into an argument. **Docket No. 34, at ¶ 30; Docket No. 38, at ¶ 30.[4]** Notwithstanding, during the Program Review, ROI's executives discussed with Gómez what they felt were serious problems with the housing development projects. **Docket No. 34, at ¶ 31; Docket No. 38, at ¶ 31.**

On February 3, 2005, Gómez was given a Notice of Disciplinary Probation ("NDP"). Gómez conceded that the NDP pointed out the various issues that had been brought to her attention and that ROI's executives understood she needed to focus on to improve her performance in these areas as well as create an action plan. **Docket No. 34, at ¶ 32; Docket No. 38, at ¶ 32.[5]** As part of the NDP, Gómez' job title was changed to "Director of Community Development, Puerto Rico" and she was to assist Mary Hanson in revising her job description to more accurately reflect her key areas of responsibility. **Docket No. 34, at**

same, as L. Civ. R. 56(c) requires. Gómez admitted this statement during her deposition. Thus, her prior self-evaluation and the reasons given to later terminate her do no contest her deposition testimony regarding this specific statement.

4. Plaintiffs attempt to contest this statement by citing to Gómez' deposition testimony, stating that the memorandum was not dis-

cussed at the meeting. However, this fact does not contest ROI's statement, and record evidence in support thereof, that demonstrates she was given the *opportunity* to address the listed areas of concern.

5. The fact that Gómez disagreed with the reasons stated for her disciplinary probation does not contest this statement.

¶ 35; **Docket No. 38,** at ¶ 35.[6] On February 4, 2005, Gómez received a letter from Scholes, notifying her that she was placed on disciplinary probation and that different areas of her work needed improvement. **Docket No. 34,** at ¶ 33; **Docket No. 38,** at ¶ 33.[7] Gómez was aware that if she did not comply with the work plan and the probationary period, she could be terminated. Docket No. 34, at ¶ 34; Docket No. 38, at ¶ 34.[8] Gómez conceded that changing her job title to "Director of Community Development in Puerto Rico" was part of ROI's re-structuring, which ROI had the right to do. Docket No. 34, at ¶ 36; Docket No. 38, at ¶ 36.[9] Gómez admitted that she had no reason to doubt that ROI's Board of Directors' March 2005 decision to re-name and re-design the job titles had a positive impact in streamlining job titles across the Housing & Economic Development Division. Docket No. 34, at ¶ 39; Docket No. 38, at ¶ 39.[10]

Gómez admitted knowing and participating in the discussion of restructuring her job title because ROI wanted to have somebody to deal with the development projects and have her take care of other business. **Docket No. 34,** at ¶ 37; **Docket No. 38,** at ¶ 37.[11] Gómez' job title change had no impact on her salary. **Docket No. 34,** at ¶ 38; **Docket No. 38,** at ¶ 38. On February 16, 2005, a follow-up conference call was held with Gómez regarding her work performance as well as a list of recommended things to do issued by the Rochester staff. Many other pending matters related to Gómez' work responsibilities were also discussed. **Docket No. 34,** at ¶ 40; **Docket No. 38,** at ¶ 40.

## C. Hiring Roger Hernández

Gómez knew that the Housing Development program was consuming much of her time, in detriment to the other programs that she was responsible for. **Docket No. 34,** at ¶ 41.[12] Gómez felt that there was a

6. Plaintiffs qualify the statement by stating that Mary Hanson did not request Gómez' input for the job description. However, the record evidence plaintiffs offer does not support this contention.

7. The fact that Gómez did not agree with, or accept, the reasons stated for her disciplinary probation does not contest this statement.

8. The fact that Gómez did not agree with the reasons stated for her disciplinary probation, does not contest the fact that she was aware of the consequences of not complying with her probationary period.

9. Although plaintiffs qualify the statement by introducing deposition testimony that states that the change was different from what Gómez had requested and initially agreed upon, the statement remains uncontested inasmuch as *Gómez admitted to the re-structuring during her deposition.*

10. Plaintiffs attempt at qualifying the deposition testimony by restating the understanding Gómez had with her employer that she would retain control and oversee the operations in

Puerto Rico. However, this does no qualify her deposition testimony where she admitted having understood the employer's decision was a managerial one geared to have a positive impact on the Housing & Economic Division.

11. Plaintiffs again try to qualify the statement by asserting there was a prior agreement that Gómez would get an assistant for the day to day activities and would retain decision making authority. However, the uncontested fact remains that Gómez did, in fact, participate in the process of restructuring her position because the company wanted someone to focus with the development projects, so she could focus on other areas.

12. Although plaintiffs deny the statement, the record evidence corroborates the same. Further, the evidence plaintiffs offer to counter the statement only qualifies it. Gómez thought the person hired would assist her and she would retain control. However, Gómez admitted that the program was consuming a lot of her time, in detriment to the other programs she was responsible for. Whether

need to hire someone as a Housing Developer. **Docket No. 34,** at ¶ 42. Gómez requested an additional person to staff the Puerto Rico division and work as a Housing Developer. **Docket No. 34,** at ¶ 43; **Docket No. 38,** at ¶ 43.[13] The reason for hiring someone for Housing Development was to relieve Gómez of the time she was devoting to this area so that she could dedicate more time to other ROI programs in Puerto Rico. **Docket No. 34,** at ¶ 44.[14]

Gómez had the task of reviewing applicants and interviewing candidates for the Housing Development position. **Docket No. 34,** at ¶ 45; **Docket No. 38,** at ¶ 45. This interview process began in December 2004. Gómez initiated the postings. **Docket No. 34,** at ¶ 46; **Docket No. 38,** at ¶ 46. On or about January 18, 2005, Hernández sent a letter with his resume to ROI's Adjuntas office, applying for the Housing Developer position. **Docket No. 34,** at ¶ 47; **Docket No. 38,** at ¶ 47. Gómez interviewed Hernández and felt he was qualified for the position. Out of the four finalists that Gómez recommended for the position, which included one woman, Gómez ranked Hernández as the best. **Docket No. 34,** at ¶ 50; **Docket No. 38,** at ¶ 50. Gómez recommended Hernández be offered that position at a higher salary level than that which was initially posted. **Docket No. 34,** at ¶ 48. At the time Gómez issued her recommendation, she had already interviewed approximately 12 candidates. She felt that Hernández was "the candidate" within the salary range and recommended him to Mitchell and Golden. **Docket No. 34,** at ¶ 49; **Docket No. 38,** at

¶ 49. Gómez admitted that she recruited Hernández.

On or about March 14, 2005, Hernández was appointed Director of Housing Development for Puerto Rico, reporting directly to Golden. The letter of appointment was sent by Golden to Hernández with copies to Mitchell, Gómez, and Scholes. **Docket No. 34,** at ¶ 51; **Docket No. 38,** at ¶ 51. Hernández was hired at the "director's" base salary. **Docket No. 34,** at ¶ 52; **Docket No. 38,** at ¶ 52. The company decided that Golden would be Hernández' direct supervisor, instead of Gómez. **Docket No. 34,** at ¶ 53; **Docket No. 38,** at ¶ 53. Gómez got upset with the fact that Hernández was going to report directly to Golden. **Docket No. 34,** at ¶ 54; **Docket No. 38,** at ¶ 54. When Gómez saw the appointment letter, she disagreed with Golden and Mitchell over the business decision of having Hernández report to Golden, rather than to her. **Docket No. 34,** at ¶ 55; **Docket No. 38,** at ¶ 55. Hernández' appointment letter stated that Gómez was to transition out of the real estate development. Nonetheless, Gómez admitted that it was a business decision ROI made, which she did not agree or like. **Docket No. 34,** at ¶ 57; **Docket No. 38,** at ¶ 57.

Gómez admitted that ROI, as the employer, had the right to eliminate her project development job responsibilities and assign them to somebody else. She also admitted that ROI had the right to decide that the person hired would report to Golden, rather than her. **Docket No. 34,** at ¶ 58; **Docket No. 38,** at ¶ 58. Gómez' salary and compensation were not affected

the person hired would report to her or report to another, as plaintiff contends, does not counter this statement.

**13.** The fact that Gómez requested someone to assist her, instead of someone to be in charge of the program, does not contest or qualify

the fact that she indeed requested additional staff to work in housing development.

**14.** Again, plaintiffs' understanding that hiring someone would only relieve Gómez partially, instead of fully, of her duties in this area does not contest the statement.

as a result of having Hernández report to Golden. **Docket No. 34, at ¶ 59; Docket No. 38, at ¶ 59.** Gómez admitted that Golden was the Developer of record for all of ROI's Puerto Rico projects. **Docket No. 34, at ¶ 60; Docket No. 38, at ¶ 60.** Gómez also admitted that Golden is more knowledgeable and more qualified than her in developing real estate projects in the mainland. **Docket No. 34, at ¶ 61; Docket No. 38, at ¶ 61.** Gómez further admitted that, in general, Golden would be more qualified than her to supervise Hernández in real estate projects; however, not in Puerto Rico. **Docket No. 34, at ¶ 62; Docket No. 38, at ¶ 62.**

At all times, ROI has had in full force and effect a Personnel Manual which Gómez received and had available. **Docket No. 34, at ¶ 63; Docket No. 38, at ¶ 63.** At all times, ROI has had in full force and effect a policy that prohibits discrimination on the basis of age, sex and disability. **Docket No. 34, at ¶ 64; Docket No. 38, at ¶ 64.**

### D. Gómez' Discrimination Allegations and Requests for Leaves of Absence

On March 19, 2005, five (5) days after Hernández' appointment, Gómez visited her psychiatrist, Dr. José A. Nuñez ("Dr. Nuñez"), for the first time. **Docket No. 34, at ¶ 65; Docket No. 38, at ¶ 65.** Gómez admitted that she first visited Dr. Nuñez because she felt desperate and harassed by ROI. Gómez attributed her mental state to the February 2, 2005, Rochester meeting. **Docket No. 34, at ¶ 66; Docket No. 38, at ¶ 66.** Gómez also was concerned because she did not know if her mental condition was related to her family history of mental illnesses. **Docket No. 34, at ¶ 67; Docket No. 38, at ¶ 67.**

On March 20, 2005, Gómez requested a leave of absence for two weeks, starting on March 21, 2005, until April 4, 2005, due to a severe depression. In response to her communication, Mitchell told Gómez to do whatever she needed to do to maintain her health. **Docket No. 34, at ¶ 68; Docket No. 38, at ¶ 68.** On March 21, 2005, Elizabeth Scott ("Scott"), ROI's Benefits Administrator, sent Gómez the paperwork for the disability claim regarding her severe depression. At this point, Scott did not know that Gómez' depression was work-related. **Docket No. 34, at ¶ 69.** Gómez completed the paperwork and provided ROI a Medical Certificate from Dr. Nuñez. ROI approved Gómez' request for medical leave. **Docket No. 34, at ¶ 70; Docket No. 38, at ¶ 70.** On March 29, 2005, Gómez filled out Part A "Claimant' Statement" of the Notice and Proof of Claim for Disability Benefits ("Proof of Claim") form of The Guardian Life Insurance Company ("Guardian"). **Docket No. 34, at ¶ 71; Docket No. 38, at ¶ 71.**

In the meantime, on March 31, 2005, Gómez traveled to New Jersey to take care of an emergency situation with her daughter that required surgery. Her daughter's emergency situation set back Gómez' health. As a result, Dr. Nuñez increased Gómez' medical dosage and extended her rest period to April 18, 2005. **Docket No. 34, at ¶ 72; Docket No. 38, at ¶ 72.** On April 4, 2005, Dr. Nuñez completed Part B-"Health Care Provider's Statement" of the Proof of Claim. On Part B–8 of the Proof of Claim, Dr. Nuñez stated, for the first time, that his diagnosis of Gómez' mayor depressive disorder was work-related. **Docket No. 34, at ¶ 73; Docket No. 38, at ¶ 73.** On April 15, 2005, Dr. Nuñez extended Gómez' medical rest period until May 12, 2005. **Docket No. 34, at ¶ 74; Docket No. 38, at ¶ 74.**

On April 14, 2005, Scott addressed a letter to Guardian, requesting the processing of Gómez' disability claim. **Docket**

No. 34, at ¶ 75.[15] However, Guardian denied Gómez' disability claim for her depression because it was work-related. Docket No. 34, at ¶ 76. On April 18, 2005, Scott sent an e-mail to Gómez indicating that she did not know that her disability claim was work-related and that the insurance carrier had denied the claim because it was work-related. Thus, Scott placed Gómez' on notice that her disability claim had to be processed as worker's compensation through Puerto Rico's State Insurance Fund ("SIF"). Docket No. 34, at ¶ 77. Gómez admitted that she never requested any reasonable accommodation related to her mental condition. Docket No. 34, at ¶ 78.

On or around April 20, 2005, almost a month after Hernández' appointment, Gómez sent a letter to Hanson raising for the first time her allegations of being discriminated due to her sex and age. Docket No. 34, at ¶ 79 and 86; Docket No. 38, at ¶ 79 and 86. Gómez alleged that ROI discriminated against her on the basis of age and sex because Hernández, a younger male, was appointed to substitute her on a major part of her work; though, not all of it. Docket No. 34, at ¶ 80; Docket No. 38, at ¶ 80. According to Gómez, she was discriminated because of her sex, when she was relieved of the most important part of her job (real estate development) and that

part was given to a Hernández, a male. Docket No. 34, at ¶ 81; Docket No. 38, at ¶ 81. Gómez admitted that she was never told by anybody in the company that they were relieving her and replacing her with a male because they felt that (real estate development) is more of a man's job, or words to that effect. Docket No. 34, at ¶ 82; Docket No. 38, at ¶ 82. Gómez admitted that nothing else supports her allegation of sex discrimination outside the fact that Hernández was hired and assigned the real estate development functions. Docket No. 34, at ¶ 83; Docket No. 38, at ¶ 83.

Gómez admitted that the only evidence that she has to support her allegation of age discrimination is that Hernández was younger than her. Docket No. 34, at ¶ 84; Docket No. 38, at ¶ 84. When asked if she had anything else to support her allegation of age discrimination, Gómez stated "that is it". Docket No. 34, at ¶ 85; Docket No. 38, at ¶ 85. When Gómez recommended and participated in the decision making process for Hernández' hiring, she did not raise any discrimination allegations. Docket No. 34, at ¶ 87; Docket No. 38, at ¶ 87.

On April 26, 2005, Scott sent Gómez the completed employer information of the SIF's incident report claim form. Docket No. 34, at ¶ 88; Docket No. 38, at ¶ 88.[16]

---

15. Plaintiffs attempt to counter defendant's statement with a March 11, 2009, e-mail from Marisol Sanquieche, a customer service representative for Guardian to plaintiff's attorney that states Guardian did not receive a proof of claim for Gómez' disability benefits. However, this document has not been properly authenticated and is inadmissable. "Documents supporting or opposing summary judgment must be properly authenticated." *Carmona v. Toledo*, 215 F.3d 124, 131 (1st Cir.2000) (citing Fed.R.Civ.P. Rule 56(e)). Thus, a party's "failure to authenticate a document properly precludes its consideration on a motion for summary judgment." *Robinson v. Bodoff*, 355 F.Supp.2d 578, 582 (D.Mass.2005) (strik-

ing all exhibits that were submitted without affidavits). Therefore, the court will not consider the same.

16. Instead of qualifying defendant's statement, plaintiffs' response adds facts to the summary judgment scenario. Had plaintiffs needed to add these facts, the rules governing summary judgment practice provide plaintiffs with the opportunity to submit their own uncontroverted facts in a separate statement. However, the rules do not provide for plaintiffs to add statements, within plaintiffs' responses to defendant's statement. *See* Fed. R.Civ.P. 56; L. Civ. R. 56(c).

On April 29, 2005, Gómez filed a disability claim with the SIF for her depression, alleging it was a result of the February 2, 2005, Rochester meeting. **Docket No. 34, at ¶ 89; Docket No. 38, at ¶ 89.**

### E. Gómez' SIF Leave and Request to Return to Work

On May 3, 2005, Gómez sent an e-mail to Scott, Hanson and Scholes, stating that she had visited the SIF and was notified that she could not return to work until SIF concluded their investigation of her claim. **Docket No. 34, at ¶ 90; Docket No. 38, at ¶ 90.** Gómez also informed Scott, Hanson and Scholes that she could not afford to continue without her regular income and had decided to withdraw the SIF claim. She indicated that she would return to work on May 12, 2005. **Docket No. 34, at ¶ 91; Docket No. 38, at ¶ 91.** On May 3, 2005, Scott responded to Gómez' communication indicating that unfortunately that was the normal decision making process of the SIF for a worker's compensation claim. **Docket No. 34, at ¶ 92; Docket No. 38, at ¶ 92.**[17] That same day, on May 3, 2005, Hanson replied to Gómez' e-mail, stating that the SIF was now in control and that Gómez needed to obtain and submit to Scott the medical release, prior to returning to work, inasmuch as they could not have her (Gómez) working without the medical release. Gómez then replied to Hanson and Scott, stating that she had a doctor's appointment on May 10, 2005, and he would provide her with the clearance on that same day. **Docket No. 34, at ¶ 93; Docket No. 38, at ¶ 93.**

On May 11, 2005, Hanson reminded Gómez that, prior to returning to work, she had to send her a return to work release from her doctor and the SIF's clearance, stating that her case had been withdrawn. Unless Hanson received Gómez' doctor's release and the SIF's clearance, she was not eligible to return to work. **Docket No. 34, at ¶ 94.** On May 13, 2005, Gómez conceded to Scott that she had yet to get the SIF's clearance documentation and expected to have that ready for the following week. **Docket No. 34, at ¶ 95.** Thus, after Gómez requested her claim be withdrawn at the SIF, Gómez had to obtain and deliver to ROI the SIF's letter certifying that the claim was indeed withdrawn as requested. **Docket No. 34, at ¶ 96; Docket No. 38, at ¶ 96.** As of May 20, 2005, Gómez still had not received from the SIF's certification that her claim had been withdrawn. **Docket No. 34, at ¶ 102; Docket No. 38, at ¶ 102.**

On July 15, 2005, the SIF issued a notification regarding the closing of Gómez' claim. **Docket No. 34, at ¶ 115; Docket No. 38, at ¶ 115.** Gómez admitted that, prior to this notification, the company could not let her return to work because she had not been released by the SIF. Once Gómez' claim at the SIF was withdrawn, the obstacle to return to work was eliminated. **Docket No. 34, at ¶ 116; Docket No. 38, at ¶ 116.** Gómez admitted that the SIF notified her of its determination of withdrawing her claim almost one (1) month after the letter was prepared and almost three (3) months after her claim had been filed before the SIF. **Docket No. 34, at ¶ 117; Docket No. 38, at ¶ 117.** Gómez admitted that, although she felt differently, nobody at ROI was trying to keep her out of her work; they just had to fulfill some legal requirements. **Docket No. 34, at ¶ 118; Docket No. 38, at ¶ 118.**

17. Plaintiffs admitted the statement, but qualify the same by adding facts to defendant's statement. These additional facts do not go to the crux of defendant's statement and should have been filed in a separate statement as required by Fed.R.Civ.P. 56 and L. Civ. R. 56(c).

## F. Gómez' Back Condition

Gómez has had a back condition since before she started working with ROI in 1999. **Docket No. 34, at ¶ 97; Docket No. 38, at ¶ 97.** Since the onset of Gómez' employment relationship with ROI, the company granted her a reasonable accommodation for her back condition. **Docket No. 34, at ¶ 98; Docket No. 38, at ¶ 98.** The reasonable accommodation consisted of a flexible work schedule, determined under Gómez' discretion, that allowed her to work out of ROI's office in Adjuntas some days per week, staying over in Adjuntas at a hotel paid by the company, and other week days she would work out of her home in Trujillo Alto. **Docket No. 34, at ¶ 99; Docket No. 38, at ¶ 99.**

On May 12, 2005, while on SIF's medical leave, Gómez had a non-work related setback of her back condition and requested medical leave benefits from Guardian. **Docket No. 34, at ¶ 100.** On May 19, 2005, Gómez sent Scott a note stating that she will not be able to go to work until June 5, 2005, due to her back condition. Gómez admitted that her back condition predated her employment. **Docket No. 34, at ¶ 101; Docket No. 38, at ¶ 101.** On May 20, 2005, Gómez completed Guardian's Part A- "Claimant's Statement" of the Notice and Proof of Claim for Disability Benefits form for her back condition setback. **Docket No. 34, at ¶ 103; Docket No. 38, at ¶ 103.** On May 25, 2005, Gómez' physician, Dr. Julio Calcaño, completed Part B-"Health Care Provider's Statement" for the same. **Docket No. 34, at ¶ 104; Docket No. 38, at ¶ 104.** On May 27, 2005, Scott sent a letter to Guardian submitting Gómez' new medical leave claim for her back condition. **Docket No. 34, at ¶ 105.**

On May 31, 2005, Scott gave Gómez an update on her new disability claim regarding her back condition setback, stating that the insurance broker had shared his concern about the new claim because Gómez was currently out on worker's compensation leave and not actively working; therefore, Gómez' claim could not be approved by the insurance company. **Docket No. 34, at ¶ 106.**[18] ROI had informed Gómez that, until she received the SIF's release letter, she could not be considered for other benefits because technically she was still under worker's compensation. **Docket No. 34, at ¶ 107; Docket No. 38, at ¶ 107.** Scott had no decision-making authority to approve or deny a disability benefit claim. **Docket No. 34, at ¶ 108; Docket No. 38, at ¶ 108.**[19] Gómez admitted that the decision of approving the disability claim is not made by ROI, but by the service provider. **Docket No. 34, at ¶ 109; Docket No. 38, at ¶ 109.** Guardian was the insurance provider. **Docket No. 34, at ¶ 110; Docket No. 38, at ¶ 110.**[20]

As ROI's benefits administrator, Scott maintains, coordinates and communicates the benefits for all of ROI's employees and vendors. **Docket No. 34, at ¶ 111.** Scott

---

**18.** Plaintiffs deny the statement. However, in order to contest, plaintiffs call on conclusions that do not properly rebut defendant's statement and evidence in support thereof. Further, plaintiffs' Exhibit 19 has not been properly authenticated and is inadmissable.

**19.** Plaintiffs admitted this statement, but qualify the same with additional statements that procedurally should have been filed separately. Further, plaintiffs request from this court to make factual and legal conclusions or con-

clude that a factual controversy exists, based on allegations that are supported by inadmissable evidence (plaintiffs' Exhibit 19).

**20.** Defendant did not present evidence of the brokerage relationship with HR Benefit Advisors, nor was the deponent confronted with the contract or any form of evidence to corroborate the deposition testimony defendant presents, in support of the second portion of its statement.

gathered the information and provided it to the insurance company for them to decide. The decision regarding the claims rests with the insurance company, not with Scott or ROI. **Docket No. 34, at ¶ 112.** Scott advised Gómez that the disability provider, which denied the work-related claim, would put a red flag on the new claim, in addition to the fact that she was still under the worker's compensation. **Docket No. 34, at ¶ 113.** On June 27, 2005, Gómez informed Scott that she had followed up with the SIF and the release letter was not ready yet. Thus, as of June 27, 2005, Gómez had not been able to provide any document from the SIF, releasing her from the work related claim. **Docket No. 34, at ¶ 114; Docket No. 38, at ¶ 114.**

On or about June 9, 2005, while on medical leave, and while her claim before the SIF was still pending, Gómez sent a letter to Mitchell requesting a modification to the reasonable accommodation that ROI had originally granted when she was hired. The requested modification was for a "period of three months" during which she could not "conduct long drives ... in the type of roads that comprised ..." their work area. Gómez requested to be allowed to stay at her home for the first two (2) or three (3) weeks, instead of two (2) or three (3) days per week, and then start traveling one way to and stay in Adjuntas, and travel back another day. **Docket No. 34, at ¶ 119, Exhibit 40; Docket No. 38, at ¶ 119.** ROI denied Gómez' request for modification of her previous accommodation because it was programmatically not feasible. **Docket No. 34, at ¶ 120.** Gómez admitted that her job required a lot of traveling. Gómez also admitted that an essential function of her job was to be able to travel systematically and substantially. **Docket No. 34, at ¶ 121; Docket No. 38, at ¶ 121.** At the time Gómez requested the modification to her reasonable accommodation, she was still under SIF's medical leave. **Docket No. 34, at ¶ 122.**

## G. Gómez' Termination

Rural Opportunities of Puerto Rico, Inc. ("ROPRI") is an affiliate of ROI. Its Board Members are volunteers, composed mainly of Puerto Rican farmers "campesinos." **Docket No. 34, at ¶ 123; Docket No. 38, at ¶ 123.** Most of ROPRI's Board Members rely on what Gómez told them were ROI's rules and procedures. **Docket No. 34, at ¶ 124; Docket No. 38, at ¶ 124.** ROI's financial and fiscal processes are strictly regulated by federal and state law due to the handling of many federal grants, programs and/or donations of private entities. **Docket No. 34, at ¶ 125; Docket No. 38, at ¶ 125.** Gómez had received instructions that ROPRI could not have an Island-based bank account. **Docket No. 34, at ¶ 126.[21]** On March 18, 2004, ROPRI's Board of Directors had passed a resolution authorizing its President, Pedro Bengochea ("Bengochea") and Gómez to open an island-based bank account for ROPRI. **Docket No. 34, at ¶ 127; Docket No. 38, at ¶ 127.** Gómez and Bengochea opened a bank account for ROPRI at Banco Popular of Puerto Rico. **Docket No. 34, at ¶ 128; Docket No. 38, at ¶ 128.**

Before opening the island-based account, Gómez did not inform her supervisor, Beaulac, or Kevin Ryck, ROI's Chief Financial Officer, of the opening of the ac-

**21.** Plaintiffs both qualify and deny the statement. However, the cited deposition testimony states that Gómez received instructions not to open an island-based account when she consulted the matter for the Parque Platino Project. Further, plaintiffs present additional facts, and evidence in support thereof, that should have been filed separately in plaintiffs' own statement of facts. *See* L. Civ. R. 56(c).

count. **Docket No. 34, at** ¶ 129. Gómez admitted that she instructed her assistant, Yorida Maldonado, to deposit in the RO-PRI account at Banco Popular of Puerto Rico three (3) checks made out to the order of ROI, and not ROPRI. The checks were in the amount of $2,000.00, $1,000.00 and $700.00, and were deposited in ROPRI's Banco Popular account without any authorization from ROI in Rochester. Docket No. 34, at ¶ 130.[22]

Gómez admitted not having been authorized by ROI to sign contracts opening bank accounts. **Docket No. 34, at** ¶ 131; **Docket No. 38, at** ¶ 131.[23] Gómez was aware that the Internal Revenue Service ("IRS") and relevant state authorities required ROI, as a non-profit corporation, to show all revenue and expenses, including those relative to contributions and fundraising activities. This could only be done through the accounting system at ROI's Finance Office. **Docket No. 34, at** ¶ 132; **Docket No. 38, at** ¶ 132. Gómez was aware that the procedures detailed in the fiscal procedure manual enabled the company to comply with the IRS and other relevant regulations. **Docket No. 34, at** ¶ 133; **Docket No. 38, at** ¶ 133. Gómez admitted that she was a ROI employee who managed the Puerto Rico office. She was not an employee of ROI's local affiliate, ROPRI. **Docket No. 34, at** ¶ 134; **Docket No. 38, at** ¶ 134. Gómez knew that ROI's Personnel Manual applied to

her and to ROI's Puerto Rico office. **Docket No. 34, at** ¶ 135.

On July 7, 2005, Hanson notified Gómez that they had discovered information as to the opening of an island-based bank account and that this would be a serious breach of authority and contrary to ROI's policy and specific instructions that she received from both Beaulac and Scholes. **Docket No. 34, at** ¶ 136. On August 5, 2005, Mitchell sent Gómez a termination letter. **Docket No. 34, at** ¶ 137; **Docket No. 38, at** ¶ 137. The reasons for her termination included: i) the establishment of an Island-based checking account in violation of ROI's procedures; ii) not disclosing the existence of the account; iii) depositing funds and donations that belong to and were payable to ROI (not ROPRI); in addition to, iv) the serious performance issues previously raised directly with Gómez. **Docket No. 34, at** ¶ 138.[24] Beaulac and Mitchell were the decision makers as to the hiring and firing of Gómez. **Docket No. 34, at** ¶ 139. Gómez conceded that Beaulac did not have any personal animosity towards her either. In Gómez' opinion, any comments that Beaulac could have made about Gómez' performance were for business reasons. Docket No. 34, at ¶ 140. Gómez conceded that Scholes did not have any personal animosity towards her. In Gómez' opinion, any comments that Scholes could have made about Gómez' performance were for good business reasons. **Docket No. 34, at** ¶ 141. Gómez

**22.** Plaintiffs claims the statement is false. However, the evidence offered to rebut the same does not counter the cited deposition testimony, but only serves to qualify the same. Gómez' deposition testimony states she did not seek authorization because she did not need any such authorization. Further, plaintiff adds additional facts, and evidence in support thereof, that should have been filed separately. *See* L. Civ. R. 56(c).

**23.** The evidence plaintiffs offer does not serve to qualify the statement. Instead, plaintiffs add facts, and evidence in support thereof, that should have been filed separately. *See* L. Civ. R. 56(c).

**24.** Plaintiffs deny the statement. However, the evidence offered does not counter her deposition testimony. Further, plaintiffs add facts, and evidence in support thereof, that should have been filed in her own separate statement. *See* L. Civ. R. 56(c).

admitted that Ryck and Mitchell did not have any personal animosity towards her. Docket No. 34, at ¶ 142. Gómez' position remained vacant until Woddie A. Pagán ("Pagán") was appointed ROI's Senior Community Development Director of the Puerto Rico Division, starting on January 15, 2007. Pagán was born on October 24, 1944, and is 64 years of age. Docket No. 34, at ¶ 143.

## II. Summary Judgment Standard

"Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law based on the pleadings, depositions, answers to interrogatories, admissions on file, and any affidavits." *Thompson v. Coca–Cola Co.*, 522 F.3d 168, 175 (1st Cir.2008) (citing Fed. R. Civ P. 56(c)). When ruling on a motion for summary judgment, the court "must scrutinize the evidence in the light most agreeable to the nonmoving party, giving that party the benefit of any and all reasonable inferences." *Cox v. Hainey*, 391 F.3d 25, 27 (1st Cir.2004). The court may safely ignore "conclusory allegations, improbable inferences, and unsupported speculation." *Suárez v. Pueblo Int'l, Inc.*, 229 F.3d 49, 53 (1st Cir.2000) (quoting *Medina–Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir.1990)). In addition, the "absence of evidence on a critical issue weighs against the party—be it either the movant or nonmovant—who would bear the burden of proof on that issue at trial." *Alamo Rodriguez v. Pfizer Pharma.*, 286 F.Supp.2d 144, 151 (D.P.R. 2003) (citing *Perez v. Volvo Car Corp.*, 247 F.3d 303, 310 (1st Cir.2001)).

"A dispute is genuine if the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving party." *Thompson*, 522 F.3d at 175 (quoting *Sanchez v. Alvarado*, 101 F.3d 223, 227 (1st Cir.1996)) (internal quotation marks omitted). "A fact is material if it has the potential of determining the outcome of the litigation." *Maymi v. P.R. Ports Auth.*, 515 F.3d 20, 25 (1st Cir.2008). To defeat a properly supported motion for summary judgment, evidence offered by the non-movant "must be significantly probative of specific facts." *Perez*, 247 F.3d at 317 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). As a rule, "[e]vidence that is inadmissible at trial, such as inadmissible hearsay, may not be considered on summary judgment." *Vazquez v. Lopez–Rosario*, 134 F.3d 28, 33 (1st Cir.1998). Finally, it is well settled that "[t]he mere existence of a scintilla of evidence" is insufficient to defeat a properly supported motion for summary judgment. *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505.

## III. Discussion

Plaintiffs allege that ROI discriminated against Gómez due to age, sex, and disability; that she was unjustly terminated from her employment and that the defendant violated her ERISA rights. In response, ROI moves for summary judgment arguing that: plaintiffs failed to establish a cause of action for age, sex and disability discrimination and that they have failed to establish an ERISA claim. Gómez claims she was discriminated against because ROI hired a younger male as Director of Housing Development and he took over certain housing duties. In addition, despite the initial understanding that this new hire would assist and report to her, ROI decided that the new hire was to report to someone other than her. Further, plaintiffs assert Gómez was terminated due to age, sex and disability discrimination; thus, summary judgment should not be granted. The court will address each contention in turn.

## A. ADEA/Title VII [25]

Plaintiffs aver that Gómez was discriminated against due to her age and sex because a younger male was hired to fulfill certain duties and responsibilities that were taking up a major part of her work and time. ROI, in turn, states that plaintiffs' claim should fail inasmuch as Gómez has not established a *prima facie* case of age and sex discrimination and, alternatively, ROI has put forth legitimate, non-discriminatory reasons for its employment decisions. The court agrees with defendant.

■ In order to prevail in an ADEA or Title VII claim, the plaintiffs' age or sex must have "actually played a role in [the employer's decision-making] process and had a determinative influence on the outcome." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 141, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (insertion in original); *Hoffman v. Applicators Sales & Serv., Inc.*, 439 F.3d 9, 17 (1st Cir.2006). Here, there is no direct evidence of age and/or sex discrimination. *See, e.g., Vesprini v. Shaw Contract Flooring Servs., Inc.*, 315 F.3d 37, 41 (1st Cir.2002) ("Although ... somewhat murky, the term 'direct evidence' normally contemplates only those 'statements by a decisionmaker that directly reflect the alleged animus and bear squarely on the contested employment decision.'" (emphasis omitted)). When no direct evidence of discrimination exists, the plaintiff may prove her case through the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *see Bennett v. Saint-*

*Gobain Corp.*, 507 F.3d 23, 30 (1st Cir. 2007). Therefore, the burden-shifting framework applies.

■ Under *McDonnell Douglas*, plaintiffs bear the burden of establishing a *prima facie* case of age/sex discrimination. In order to accomplish this, a plaintiff must adduce evidence: (i) that she is a member of the protected group (age-forty years; Title VII-gender); (ii) that her job performance met or exceeded the employer's legitimate expectations; (iii) that the employer actually or constructively discharged her; and (iv) that the employer had a continuing need for her services. *García v. Bristol–Myers Squibb Co.*, 535 F.3d 23 (1st Cir.2008); *Bennett*, 507 F.3d at 30 (citing *Dávila v. Corporación De Puerto Rico Para La Difusión Pública*, 498 F.3d 9 (1st Cir.2007)).

■ Once plaintiff has made out a *prima facie* case, the burden of production shifts to the defendant to articulate a legitimate, non-discriminatory reason for its adverse employment action. *See Bennett*, 507 F.3d at 30–31. The defendant's burden at this stage is only a burden of production; the ultimate burden of proof remains always with the plaintiff. *See Domínguez–Cruz v. Suttle Caribe, Inc.*, 202 F.3d 424, 430 (1st Cir.2000) ("The defendant's burden at this stage is only a burden of production; the burden of proof remains with the plaintiff at all times."). If the defendant is able to meet its burden, "the plaintiff no longer can rest on the initial inference of discrimination but, rather, must show that the defendant's articulated reason is pretextual." *Bennett*, 507 F.3d at 31 (citing *Dávila*, 498 F.3d at

---

25. The court notes that the structure of proof for demonstrating discrimination under Title VII and ADEA are analogous. These only differ in two respects: (1) at the prima facie case stage, the relevant protected class (under Tile VII-sex; under ADEA-age), and (2) at the pretext stage, the relevant discriminatory animus (sex-based or age-based). Since plaintiffs' sex and age discrimination allegations are intimately-related and the same burden-shifting standard applies under Title VII and ADEA, the court will consider them together.

16). "'At summary judgment, this question reduces to whether or not the plaintiff has adduced minimally sufficient evidence to permit a reasonable factfinder to conclude that he was fired because of his age.'" *Id.* (quoting *Dávila*, 498 F.3d at 16); *see also Torrech–Hernández v. Gen. Elec. Co.*, 519 F.3d 41, 47 (1st Cir.2008).

Gómez' sole contention regarding age and sex discrimination is that Hernández, a younger male, was hired as a Director of Housing Development when, initially, the new hire was supposed to be a Housing Developer and was to assist and report to her, not to take over these duties. Gómez claims this led to her subsequent termination. Here, it is undisputed that Gómez meets the first and third prong of both ADEA and Title VII; however, she falters at the second prong of the *prima facie* test since she fails to show that her job performance met or exceeded ROI's legitimate expectations when they decided to relieve her of the housing development duties or when they decided to terminate her. We will discuss each employment action in turn.

### i) Housing Development Duties

■ As the uncontested facts stand, on or around December 2004, Gómez had initiated the interview process for the person to assist her in housing development. This was due to the fact that admittedly, housing development was consuming much of Gómez' time and ROI's executives wanted her to focus on other duties and responsibilities that they felt she was neglecting. Along the interview process, in January of 2005, ROI's Executive Committee traveled to Puerto Rico and conducted an internal audit of the Puerto Rico operations and reviewed projects Gómez handled. On or around January 19, 2005, Mitchell issued a memorandum to Gómez and others, notifying that the specific purpose of the February 2, 2005 meeting in New York was to discuss the results of an internal audit of the Puerto Rico projects and programs. ROI found issues regarding Gómez' performance that Gómez needed to address.

Consequently, ROI held the February 2005 meeting in Rochester to discuss and create action plans regarding these deficiencies. Gómez' performance issues involved: 1) poor communication with her supervisors, subordinates and the Rochester office; 2) not consulting program managers while making decisions regarding the different projects; 3) missing conference calls with ROI's Rochester staff which left them uninformed of the programs or progress of the Puerto Rico operations; 4) complaints about Gómez' verbal abuse and disrespect towards employees and complaints about her supervisory style; and 5) her failure to meet the program's goals and the three (3) real estate development projects had serious problems, among others. At said time, Gómez was responsible for these areas. Further, Gómez was well-aware that numerous ROI executives had concerns over her performance. All these issues were addressed in the meeting. Although Gómez had the opportunity to rebut, contest, or otherwise clarify these issues at the Rochester meeting, she chose not to because she felt embarrassed. These performance issues led ROI to place Gómez on disciplinary probation. Nothing in the record holds or infers that age or sex played in ROI's decision to place her on disciplinary probation.

In fact, plaintiffs offer no evidence to counter the essential accuracy of ROI's dissatisfaction with Gómez' job performance or ROI's executives' concerns over what they felt were serious problems with housing development. Although Gómez may have disagreed with ROI's findings as

to her performance, she conceded that the comments contained in the January 27, 2005, memorandum contained her supervisor's honest appreciation of deficiencies related to her work and how the Puerto Rico division was functioning.[26] Notwithstanding, Gómez' disagreement with any of the performance issues, or the notice of disciplinary probation, these do not create a triable issue of fact to withstand summary judgment or to counter ROI's legitimate reasons for relieving her of the housing development duties. *Shorette v. Rite Aid of Maine, Inc.,* 155 F.3d 8, 15 (1st Cir.1998)(explaining that a plaintiff's personal disagreement with her employer's opinions about her job performance is not sufficiently probative to avoid summary judgment)(citing cases).

As the record holds clear, Gómez' supervisors had reiterated their concerns about her supervisory style, highlighting that her staff felt intimidated and anxious and that employees had complained about her verbal abuse and disrespect towards employees in Puerto Rico as well as Gómez' overall lack of communication with the Rochester office on all issues concerning the Puerto Rico operations and its projects. They had expressed to her their concerns over serious problems related to the housing development projects and their understanding that she was not meeting the program's goals. They had also informed they wanted Gómez to focus on other areas she had neglected. Thus, given ROI's concerns about Gómez' managerial and performance deficiencies and their expressed desire to have Gómez focus on other areas she was equally responsible for, it follows that the company would prefer Gómez transition out of housing development and have Hernández assume these duties. It also follows that Hernández would report to Golden, instead of her in an effort to bridge the communication gaps with Puerto Rico. Golden was the developer of record in all of ROI's projects in Puerto Rico and admittedly had more experience, was more knowledgeable and more qualified than her in developing real estate projects in the mainland.

Although not satisfied with the business decision, Gómez conceded that ROI had the right to realign and restructure its operations as it deemed fit and that ROI's restructuring was aimed to streamline its operations. Gómez' salary and compensation remained the same. She admitted this decision was a business decision ROI had the right to make. The fact that she disagreed with ROI's business decision does not create a Title VII and/or ADEA discrimination claim. *See Gonzalez v. El Dia, Inc.,* 304 F.3d 63, 69 (1st Cir.2002) (stating "no matter how mistaken the firm's managers, [the ADEA] does not interfere") (internal citations omitted); *Mesnick v. General Elec. Co.,* 950 F.2d 816, 824 (1st Cir.1991) ("it is not enough for a plaintiff merely to impugn the veracity of the employer's justification; he must elucidate specific facts which would enable a jury to find that the real reason ... [was] age discrimination."); *see also Mulero-Rodríguez v. Ponte, Inc.,* 98 F.3d 670, 674 (1st Cir.1996)(issue not whether the reasons proffered were real but whether the employer believed them to be so.)

Finally, the facts in this case strongly sway against age and/or sex discrimination. First, Gómez was hired when she was 49 years old, that is, within the protected age. All of her supervisors and ROI's executives are also in the protected

---

**26.** In fact, Gómez was upset mainly at the manner in which the issues were expressed (not in a professional manner), not at the accuracy or inaccuracy of the flaws found in her performance.

age and are considerably older than her: Mitchell (64); Beaulac (61); Scholes (61); and Golden (71). Even Hernández belonged to the protected age group when hired at age 47. When the decision-makers are older than the aggrieved employee, courts have been dissuaded from finding age-discrimination. *See Fairchild v. Forma Scientific, Inc.*, 147 F.3d 567 (7th Cir. 1998); *Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466 (11th Cir.1991); *Hernandez–Marrero v. Crowley American Transport, Inc.*, 206 F.Supp.2d 279 (D.P.R.2002). More so, the majority of ROI's employees were within the protected age group and those who hired Gómez were the same responsible for the decision to terminate her.

On the other hand, the only evidence plaintiff offers to prove gender discrimination was the fact the Hernández is a male. This alone is insufficient. The record is clear that Gómez was in charge of the review of applications, the selection of candidates to interview, and the interview process for the Housing Developer position. After participating in the interviews, she created a list of four finalists and issued her recommendation as to the best candidate. Out of the four finalists, one was a woman. However, Gómez chose Hernández as the most qualified candidate for the available position. She also recommended Hernández receive a higher salary than that which was initially offered at the job posting. Given Gómez' recommendations, ROI hired the housing development recruit that she recommended, who happened to be a male. Thus, she cannot now claim, without more, that ROI's decision to follow her own recommendation and hire the male was gender-biased or discriminatory. Again, as stated above, she was well aware that ROI had the right to realign its operations and restructure her responsibilities in an effort to redirect its Puerto Rico division.

### ii) Termination

Plaintiffs also challenge ROI's decision to terminate Gómez, arguing, for the most part, that it was pretext. However, as is evidenced in the record, ROI had highlighted that one of Gómez' performance flaws was her continued failure to communicate with her superiors and keep them abreast of the Puerto Rico operations. They also stated that she was unavailable when they needed to reach her to discuss the Puerto Rico programs. These issues were addressed through memoranda, at the Rochester meeting, on her NDP and in a follow-up conference call. In the same, ROI's executive committee emphasized their need to be informed and consulted regarding the matters of the Puerto Rico operations. Gómez knew that failure to rectify these performance flaws and her failure to comply with the probationary period could result in her termination. Despite these clear and unequivocal warnings accentuating her need to consult upper management, Gómez opened the island bank account without consulting any of her superiors, let alone seeking their authorization.

Thus, Gómez' justification that the by-laws had no express prohibition on opening the account and that she opened the account along with Bengochea, is unavailing. The fact remains that she, not Bengochea, had been denied authorization to open an island bank account. Further, she, not Bengochea, had been put on notice that she needed to effectively communicate and consult with her superiors regarding the Puerto Rico operations. She was the ROI employee who knew ROI, as a non-profit organization, had to abide by certain reporting requisites and that ROI followed established accounting practices and procedures, implemented through ROI's Finance Department.

As highlighted above, Gómez fails to meet the second prong of the *prima facie* showing that she did not meet ROI's legitimate job expectations. The record denotes a faltering relationship between ROI's upper management and Gómez that was aggravated by a communication breakdown. Gómez was not consulting the Puerto Rico matters with the Rochester staff. Further, she was not meeting ROI's goals and objectives. These performance issues led to her placement on disciplinary probation. She knew she could be terminated if she did not comply with the probationary period. Adding to this already aggravated situation, she opened a bank account, without consulting anyone at ROI, in spite of prior instructions not to. Accordingly, the court need proceed no further. *Dionne v. Potter,* No. Civ. 02–11837, 2005 WL 1527616 (D.Mass. June 21, 2005) (granting summary judgment where plaintiff failed to show that he met the employer's legitimate expectations); *Hillstrom v. Best Western TLC Hotel,* 265 F.Supp.2d 117 (D.Mass.2003) (same). However, assuming plaintiff's established an ADEA/Title VII *prima facie* showing, as discussed further in the pretext section, plaintiff claims also fail inasmuch as she is also unable to prove pretext.

**B. ADA Claim**

■ The ADA prohibits certain types of discrimination in the workplace against an otherwise qualified individual with a disability. 42 U.S.C. § 12101, *et seq.* To establish a claim of disability discrimination under the ADA, plaintiff must first establish a *prima facie* case by showing: (I) that she is disabled within the meaning of the ADA; (ii) that she is able to perform the essential functions of her job, with or without reasonable accommodation; and (iii) that the adverse employment decision was based in whole or in part on her disability. *Phelps v. Optima Health Inc.,* 251 F.3d 21, 24 (1st Cir.2001); *Marcano–*

*Rivera v. Pueblo Int'l,* 232 F.3d 245, 251 (1st Cir.2000); *García–Ayala v. Lederle Parenterals, Inc.,* 212 F.3d 638, 646 (1st Cir.2000); *Soto–Ocasio v. Federal Express,* 150 F.3d 14, 18 (1st Cir.1998).

If plaintiff establishes a *prima facie* case, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for its employment decision and produce "credible evidence to show that the reason advanced was the real reason" for the employment action. *Tobin v. Liberty Mutual Ins. Co.,* 433 F.3d 100, 105 (1st Cir.2005) (citing *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)). If defendant offers such a reason, the burden shifts back to plaintiff to establish that defendant's non-discriminatory reason was pretextual. *See id.* At all times the ultimate burden of proving discrimination lies with plaintiff. *Reeves v. Sanderson Plumbing Prod. Inc.,* 530 U.S. 133, 143, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000).

■ The term "discriminate" includes "... not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business of [the employer]." 42 U.S.C. § 12112(b)(5)(A). Reasonable accommodations may include "job restructuring, part-time or modified work schedules, reassignment to a vacant position ... and other similar accommodations for individuals with disabilities." 42 U.S.C. § 12111(9). Thus, to survive a motion for summary judgment on a failure-to-accommodate claim, such as the one at bar, a plaintiff must furnish significantly probative evidence that: (a) she is a qualified individual with a disability within the meaning of the applicable statute; (b) that

she works (or worked) for an employer whom the ADA covers; (c) that the employer, despite knowing of the employee's physical or mental limitations, did not reasonably accommodate those limitations; and, (d) that the employer's failure to do so affected the terms, conditions, or privileges of the plaintiff's employment. *See Higgins v. New Balance Athletic Shoe, Inc.*, 194 F.3d 252, 264 (1st Cir.1999)(internal citations omitted).

■■ In a failure to accommodate claim, plaintiff must show that "the accommodation would have enabled her to perform the essential functions of the job-and that the accommodation would have been reasonable in light of relevant factors such as expense, size of the employer, etc." *Ríos–Jiménez v. Principi*, 520 F.3d 31, 41 (1st Cir.2008); *see also Reed v. LePage Bakeries, Inc.*, 244 F.3d 254, 259 (1st Cir.2001) (for a proposed accommodation to be reasonable, a plaintiff must prove that the proposed accommodation would enable her to perform the essential functions of her job and that it is feasible for the employer under the circumstances.)

In the instant case, Gómez had a back condition. Since the onset of her employment relationship with ROI, the company granted Gómez a reasonable accommodation, which consisted of allowing Gómez, at her discretion, to work from her home two or three days a week and then work in the Adjuntas office a few days, staying overnight at a company-paid hotel. Sometime in March 2005, while she was on worker's compensation leave for work-related depression, she had a setback in her back condition. On or around June 9, 2005, she requested a modification to her reasonable accommodation, for at least a three month period, that consisted in working from her home for the first two or three weeks (instead of two or three days) and then alternate by traveling to and staying in Adjuntas. The requested accommodation was considered programmatically unfeasible, and as such was denied.[27]

Here is where Gómez' failure-to-accommodate claim fails. First, it is noted that at the time she requested a modification of her reasonable accommodation, Gómez was still on worker's compensation leave and had not received any clearance from the SIF to return to work. Therefore, since she was on leave, Gómez is unable to prove that she could comply with the essential functions of her job at the time she made the request. In fact, she could not because she did not know when the SIF would release her.[28] At the time, both Gómez and ROI were unclear as to when Gómez would return to work. Therefore, when Gómez submitted her request, she was unable to work or comply with the essential functions of her work, with or without a reasonable accommodation. Further, it is speculative at best, that Gómez would have needed the modification of her reasonable accommodation upon her return because the modification requested was to cover an initial three week term, and then she would resume the same accommodation ROI had given her ever since the onset of her employment. More so, the record reflects Gómez never reinstated or renewed her request for modification of her previous accommodation upon her return to work.

Further, even assuming plaintiffs had presented a *prima facie* case of disability discrimination, as explained below, they

---

**27.** The court further notes that Gómez has not presented any evidence that the modification to her reasonable accommodation would enable her to do the essential functions of her job or to counter her supervisor's understanding that the modification was programmatically unfeasible.

**28.** She was subsequently released from SIF by July 15, 2005.

fail to show that ROI's proffered reasons for termination were pretextual or hide disability discrimination. *See McDonnell Douglas,* 411 U.S. at 802–04, 93 S.Ct. 1817.

## C. Pretext

█ Assuming *arguendo* that plaintiffs' *prima facie* showing had been made, they have failed to establish that ROI's legitimate, non-discriminatory reasons for its employment decisions, (i.e.: relieving her of housing development duties and her later termination—namely, Gómez' failure to properly perform the functions of her job and her failure to consult or get authorization to open an account in Puerto Rico)— are pretextual. Instead, she relies on her own belief and speculation about defendant's "true" reasons. Moreover, the only "evidence" Gómez offers to support these claims is her assertion that Hernández, the housing development recruit, was supposed to report to her, rather than assume some of her duties, and that the company by-laws did not prohibit her from opening the island-based bank account.

Regarding ROI's managerial decision to relieve her of housing duties, Gómez also submits a November, 2004 self-evaluation, where she rated herself above-average. Based on said self-evaluation, Gómez attempts to clout age and sex discrimination and to establish she met the employer's expectations. Gómez' supervisor approved this evaluation. However, the seeming inconsistency between the self-performance evaluation and her NDP and subsequent relief of housing duties dissipates when placed in context. In January 2005, after the November 2004 evaluation, ROI conducted an audit of its Puerto Rico operations and found various areas of serious deficiencies. Plaintiffs' challenge is belied by the fact that the record shows that ROI was dissatisfied with Gómez' performance since the January 2005 audit. In February of 2005, she was handed a memorandum listing the areas of concern, and was called into a meeting with ROI's executive staff to address these concerns and establish action plans for each area. She was placed on disciplinary probation by way of the NDP. In the memorandum, during the Rochester meeting and in the NDP, her supervisors had clearly expressed their serious concerns with Gómez' supervisory and managerial execution. Gómez knew if she did not comply with her probationary period, she could be terminated. Despite these warnings, plaintiff opened an account and deposited monies in the account without consulting, seeking authorization or otherwise informing her superiors or anyone at ROI of this. Notice of breach of her duties was once again provided to Gómez.

Plaintiffs contend pretext is hidden in ROI's conflicting stories regarding its reason for Gómez' termination. However, after close perscrutation of the record, the court finds none. Mitchell's deposition testimony was consistent when he stated the main reason for termination was the opening of the island based account. This, coupled with ROI's continued concerns over Gómez' performance which created the need of placing her on disciplinary probation, was, as defendant's aver, the straw that broke the camel's back. The record is devoid of contradiction. Again, the fact that she had an above-average evaluation in November 2004, does not circumvent the fact that, later; in January of 2005, ROI audited its Puerto Rico operations and found serious deficiencies with Gómez' performance and that her poor performance made ROI place her on disciplinary probation. Further, plaintiffs have not presented any evidence to show that either age, gender or disability discrimination was the real reason, or even a motivating factor, in ROI's decision to terminate her. The record evinces ROI's growing frustration with Gómez' lone gun practice of engaging in decision-making

without consulting the central offices. This situation escalated to the point that she, while on disciplinary probation, in flagrant violation of company policies and practices opened an island bank account, unbeknownst to her superiors and deposited checks without any authorization to do so.

Setting aside the *prima facie* case and turning "instead, to whether there is evidence that, notwithstanding the employer's stated reasons for the termination, the real reason, at least in part, was ... discrimination," *Fontánez–Nuñez v. Janssen Ortho LLC*, 447 F.3d 50, 56 (1st 2006)(citing *Hillstrom v. Best Western TLC Hotel*, 354 F.3d 27, 31 (1st Cir.2003)), the court finds none. Gómez has not offered any evidence from which to conclude that ROI's job expectations were unlawful or pretextual. Further, the record holds no evidence from which to draw that ROI's proffered reasons for relieving her of the housing development duties and later terminating her were not the real reasons. Despite plaintiffs' challenges, they are unable to prove that ROI's legitimate nondiscriminatory reasons for its decisions regarding Gómez' employment are a sham.

The determination to have Hernández assume the housing development duties and report directly to Golden and the decision to terminate Gómez, obeyed ROI's growing concern with Gómez' supervisory and managerial performance, her failure to meet the program's goals and failure to keep ROI abreast, or even consult with ROI's upper management, on matters concerning the Puerto Rico operations. The factors, were accentuated even more by her opening of the bank account and depositing certain monies, without informing anyone at ROI. The later being one among a series of reported deficiencies. *See García v. Bristol–Myers Squibb Co.*, 535 F.3d at 34 (affirming summary judgment while noting the record "more than adequately

demonstrates García's poor work performance and the deterioration of her performance over the course of her PIP, which she essentially does not dispute. Similarly, the record does not provide any support for the proposition that the evaluation process itself was tainted by ... bias").

As the First Circuit has stressed, "courts in employment discrimination cases may not act as super personnel departments, substituting judicial judgments for the business judgments of employers." *Arroyo–Audifred v. Verizon Wireless, Inc.*, 527 F.3d 215, 221 (1st Cir.2008)(internal citations and quotations omitted); *Macone v. Town of Wakefield*, 277 F.3d 1, 5 (1st Cir.2002) (plaintiffs "are entitled to all inferences which are fairly supported by the evidence, but are not permitted to build their case on mere opprobrious epithets of malice or the gossamer threads of whimsy, speculation and conjecture"); *see also Hoeppner v. Crotched Mountain Rehab. Ctr., Inc.*, 31 F.3d 9, 14 (1st Cir.1994) ("Even in discriminatory discharge cases, where the plaintiff can rarely present direct, subjective evidence of an employer's actual motive, the plaintiff cannot survive summary judgment with 'unsupported allegations and speculations', but rather must 'point to specific facts detailed in affidavits and depositions that is, names, dates, incidents, and supporting testimony giving rise to an inference of discriminatory animus.'") (quoting *Lipsett v. Univ. of Puerto Rico*, 864 F.2d 881, 895 (1st Cir.1988)); *Medina–Muñoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir.1990) (explaining that in discrimination cases, summary judgment is appropriate where the nonmoving party rests entirely upon "conclusory allegations, improbable inferences, and unsupported speculation" on any essential element of the discrimination claim).

The court has combed the record, the statements of fact, the admissible evidence

in support of the same, and find defendant's stated reasons for its employment actions stand. Plaintiffs have not met their burden of proving pretext to hide either age or gender discrimination in Gómez' relief of housing development duties, nor has Gómez established that gender, age and/or disability discrimination played a role in ROI's decision to terminate her. Thus, Gómez' ADEA, Title VII and ADA claims fail.

## D. ERISA

 As the law makes clear, "ERISA contemplates actions against an employee benefit plan and the plan's fiduciaries." It does not, however, in most situations, "authorize actions against nonfiduciaries of an ERISA plan." *Terry v. Bayer Corp.*, 145 F.3d 28, 35–36 (1st Cir. 1998) (quoting *Santana v. Deluxe Corp.*, 920 F.Supp. 249, 253 (D.Mass.1996)); *see also Reich v. Rowe*, 20 F.3d 25, 29 (1st Cir.1994) (nonfiduciary liability limited to those "who commit violations of ERISA or who are engaged in an 'act or practice' proscribed by the statute"); *Negrón–Fuentes v. UPS Supply Chain Solutions*, 532 F.3d 1, 10 (1st Cir.2008) ("And an employer who is not an administrator is not otherwise a proper defendant in an ERISA benefits action.") (citing *Beegan v. Assoc. Press*, 43 F.Supp.2d 70, 73 (D.Me. 1999)). Based upon the undisputed material facts, ROI, who was Gómez' employer, did nothing more than provide her with the group's disability claim application, complete the employer's portion of her application and forwarded the application to Guardian. Additionally, ROI, Scott, or any of ROI's agents, were not the plan's sponsor, service provider, administrator or fiduciary. Gómez concedes that Scott did not have decision-making authority to approve or deny her claims. Further, Gómez admitted that the decision of approving the disability claims is not made by ROI, but by the service provider. Finally, the record is clear that Scott, or any of ROI's agents, did not influence or control the administration of the plan or the decision to approve or deny disability claims.

Based upon the foregoing, no reasonable fact finder could conclude that ROI acted as the employee benefit plan or the plan's fiduciary. For this reason, plaintiffs' ERISA claims against ROI are **DISMISSED WITH PREJUDICE.**

## E. Supplemental Jurisdiction

Since the federal claims have been dismissed, and no other grounds for jurisdiction exists, the court declines to exercise supplemental jurisdiction over plaintiffs' remaining state law claims. *See Carnegie–Mellon Univ. v. Cohill*, 484 U.S. 343, 349, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988) (explaining that the exercise of pendent jurisdiction is a matter of the federal court's discretion and not one of plaintiff's rights); *United Mine Workers v. Gibbs*, 383 U.S. 715, 725, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966) (stating "if the federal claims are dismissed before trial, ... the state law claims should be dismissed as well."). Accordingly, plaintiffs' claims brought pursuant to Commonwealth law are **DISMISSED WITHOUT PREJUDICE.**

## IV. Conclusion

Based upon the foregoing, defendant's motion for summary judgment (**Docket No. 33**) is **GRANTED.** Plaintiffs' federal claims are hereby **DISMISSED WITH PREJUDICE.** Their Commonwealth of Puerto Rico law claims are **DISMISSED WITHOUT PREJUDICE.**

**SO ORDERED.**